MANUFACTURERS' LAND & IMPROVEMENT COMPANY *v.* UNITED STATES SHIPPING BOARD EMERGENCY FLEET CORPORATION AND PUBLIC SERVICE RAILWAY COMPANY.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE THIRD CIRCUIT.

No. 181.　Argued January 21, 1924.—Decided March 3, 1924.

The Act of March 1, 1918, c. 19, 40 Stat. 438, empowering the United States Shipping Board Emergency Fleet Corporation to requisition land for the construction thereon of houses for employees, and the families of employees, of shipyards in which ships were being constructed for the United States, and to construct on such land for their use houses " and all other necessary or convenient facilities ", etc., authorized the taking of land for an electric railway terminal, for the purpose of providing convenient transportation for employees of a nearby shipyard, and their families, for whom housing was being provided under the act on other land in close proximity. P. 253.

284 Fed. 231, affirmed.

ERROR to a judgment of the Circuit Court of Appeals which affirmed a judgment of the District Court for the defendants in error in an action in ejectment brought against them by the plaintiff in error.

*Mr. Francis D. Weaver,* with whom *Mr. John W. Wescott* and *Mr. Samuel B. Scott* were on the brief, for plaintiff in error.

*Mr. Alfred A. Wheat,* Special Assistant to the Attorney General, with whom *Mr. Solicitor General Beck* was on the brief, for defendants in error.

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

This was an action in ejectment by the land company against the fleet corporation and the public service com-

pany for a small tract of land in Camden, New Jersey. The action was begun in a state court and removed to the District Court of the United States, where, after trial, judgment was given for the defendants. The judgment was affirmed by the Circuit Court of Appeals. 284 Fed. 231.

The facts out of which the case arose are easily stated.

On and prior to May 28, 1918, the land in question was owned and possessed by the land company, and was without buildings or other improvements. It was in close proximity to shipyards where ships were being constructed for the United States for service in the World War, and was also in close proximity to other lands in which the fleet corporation had acquired an interest and on which it had caused, or was causing, many houses to be constructed for the use of the shipyard employees and their families. On that day the fleet corporation, acting under the Act of March 1, 1918, c. 19, 40 Stat. 438, requisitioned the fee simple title of the land and took possession. Afterwards, in conformity to the act, the fleet corporation determined the compensation to be made for the land, the amount being $19,743.20. The land company did not accept that sum or any part of it, but questioned the authority of the fleet corporation to make the requisition and take possession.

After the land was requisitioned, the fleet corporation constructed thereon a loop of electric railway tracks with platforms and sheds, connected the same with an adjacent electric railway line operated by the public service company, and contracted with that company to run its cars over the newly made loop to and from the platforms and sheds so constructed, all for the purpose of providing necessary and convenient transportation facilities for the employees of the shipyards and their families. The land was suitable for that purpose and, when the improvements were completed, was used therefor under the con-

tract between the fleet corporation and the public service company. No houses were constructed on the land by the fleet corporation; nor was it used otherwise than in providing the transportation facilities just described.

The action in ejectment was brought on the assumption that the land was unlawfully taken by the fleet corporation in that the declared purpose of the taking was to use the land in housing the employees and their families, when in truth the purpose was to use it for an electric railway terminal, or to enable the public service company so to use it, and that the fleet corporation was without authority to take it for such terminal use. Whether that assumption was well or ill grounded is the question presented on this writ of error.

The material part of the Act of March 1, 1918, under which the fleet corporation acted, reads as follows:

"That the United States Shipping Board Emergency Fleet Corporation is hereby authorized and empowered within the limits of the amounts herein authorized—

"(a) To purchase, lease, requisition, including the requisition of the temporary use of, or acquire by condemnation or otherwise any improved or unimproved land or any interest therein suitable for the construction thereon of houses for the use of employees and the families of employees of shipyards in which ships are being constructed for the United States.

"(b) To construct on such land for the use of such employees and their families houses and all other necessary or convenient facilities, upon such conditions and at such price as may be determined by it, and to sell, lease, or exchange such houses, land, and facilities upon such terms and conditions as it may determine.

"(c) To purchase, lease, requisition, including the requisition of the temporary use of, or acquire by condemnation or otherwise any houses or other buildings for the use of such employees and their families, together with the land

on which the same are erected, or any interest therein, all necessary and proper fixtures and furnishings therefor, and all necessary and convenient facilities incidental thereto; to manage, repair,. sell, lease, or exchange such lands, houses, buildings, fixtures, furnishings and facilities upon such terms and conditions as it may determine to carry out the purposes of this Act.

"(d) To make loans to persons, firms, or corporations in such manner upon such terms and security, and for such time not exceeding ten years, as it may determine to provide houses and facilities for the employees and the families of employees of such shipyards.

" Whenever said United States Shipping Board Emergency Fleet Corporation shall acquire by requisition or condemnation such property or any interest therein, it shall determine and make just compensation therefor, and if the amount thereof so determined is unsatisfactory to the person entitled to receive the same, such person shall be paid seventy-five per centum of the amount so determined, and shall be entitled to sue the United States to recover such further sum as added to such seventy-five per centum will make such an amount as will be just compensation for the property or interest therein so taken."

The requisition, as set forth in the record, shows that the land was desired and was taken " for the uses and purposes " expressed in the act, and not, as asserted by the land company, for the sole and declared purpose of using it for housing the employees and their families. So, if the act authorized a taking to provide necessary or convenient facilities whereby these people readily could reach and use local car lines, that purpose was comprehended in the terms of the requisition.

The land company apparently takes the position that subdivision (a) of the act is alone to be considered. If this position were right, there would be good ground for

thinking that the only purpose for which a taking was authorized was to provide housing facilities. But subdivision (b) must also be considered. It and subdivision (a) are so plainly interrelated that they must be read together. When this is done, it is obvious that the purposes for which a taking was authorized were not confined to providing housing facilities but extended to providing " all other necessary or convenient facilities " for the use of the employees and their families. Other parts of the act, notably subdivisions (c) and (d), strengthen this conclusion. Of course the act must be examined as a whole, and not as if each part were an independent enactment. Its purpose was to facilitate the accomplishment of large undertakings wherein it was necessary to employ artisans and laborers in unusually large numbers, and to utilize their services in the best possible way. It recognized not only that they and their families should be housed, but that many other necessary or convenient facilities should be provided for their use; and to these ends it authorized an expenditure of fifty million dollars.

Whether artisans or laborers could be obtained and retained in requisite numbers would measurably be affected by the conditions surrounding them in the employment, such as the facilities for going from their places of living to their places of work, and the converse, and the facilities for reaching markets, schools and churches from their places of living.

Here what was done was to provide facilities whereby an extensive electric railway service in the city of Camden was brought, with a suitable terminal, into close proximity to the shipyards and to the lands where houses were provided for the use of the employees and their families. In our opinion these transportation facilities were of a class which the fleet corporation was authorized to provide and for which it was empowered to requisition or take needed land. They were a legitimate complement

to the housing facilities provided by the corporation in that vicinity,—at great cost according to the record.   It was not essential under the act that the other facilities be on the same tract with the houses any more than that all the houses be on a single tract.   The act was intended to be susceptible of practical 'application in varying situations.

We conclude that the action of ejectment was brought on a mistaken assumption and was rightly determined against the land company by the courts below.   Questions which would arise if the assumption or any material part of it were well grounded need not be considered.

*Judgment affirmed.*

Mr. Justice McKenna, dissenting.

I concur in the judgment of the Court.   I dissent from the grounds upon which the Court bases it.   It is my opinion that the record establishes that the requisition of the land was made under the first paragraph (a) of the Housing Act of March 1, 1918, the fee simple in the land acquired and, necessarily, it became subject to all of the uses accessorial to the fee, every use whatever; for the use of trolley tracks to connect with a street railway as in this case, or for the erection of a church for the spiritual guidance of employees and their families, or for a dance hall and an accompanying refectory for the amusement of their leisure.   Indeed, for any use under the sun.

Twenty days after the requisition, the President seeing the situation and that the land was so subject, availed of it—availed of the power given him under the Act of April 22, 1918, c. 62, 40 Stat. 535, to take over transportation systems for the transportation of shipyard and plant employees, issuing his executive order of June 18, 1918, by which he directed that the Fleet Corporation should " have and exercise all power and authority vested " in him by

the act. By this direction and delegation, the Fleet Corporation proceeded to construct the trolley tracks with the assistance of the Public Service Railway Company, a defendant in the case. The land became a terminal for the latter Company.

The act of the President was in the public service, but it was not an act of requisition of the land, it was after the requisition of the land,—not its requisition. If this were not so there is color for the accusation of the Land & Improvement Company that the Housing Act was used as a pretense—used under the pretense of acquiring land for the building of houses when the purpose was, in effect, a different one.

During the taking of the testimony, counsel for the Fleet Corporation several times declared that the requisition was under the Housing Act and that whatever use the land was subsequently put to was immaterial.

I quote from the record as follows:

" Now then, the power under which we took this land was a power delegated under 40 Statutes 438, directly delegated to the Fleet Corporation so that we could not in this requisition say that the Fleet Corporation took this land by virtue of the Act of March 1, 1918, and by virtue of the Act of April 22, 1918, because the power was not given to us under both of those Acts, it was only [given] under one of them.

" The Court: You claim you were the deputy of the President?

" Mr. Pearse: Later.

" Mr. Jacobsen: After the taking of the land we claim we were. At the time we took the land we had the right to take it by virtue of statute, and after *we had it we used it by virtue of power delegated to us by the President.* [Italics mine.] Those are the actual facts; in other words, we took this land under a direct power delegated to us."

It will be observed that Mr. Pearse, of counsel for the Fleet Corporation, in response to the Court's inquiry as to when the Fleet Corporation became the deputy of the President, answered, " Later." It will also be observed that Mr. Jacobsen, of counsel for the Fleet Corporation, continuing his comment said that, " after the taking of the land we [the Fleet Corporation] claim we were." " Later ", and " after the taking of the land ", meaning after the executive order. Until it there is nothing in the record to show that there was prophecy or thought of trolley tracks or transportation systems.

The opinion of the Court now delivered is, in my view, in opposition to this. There is an attempt at consistency with it by the declaration that the requisition was under the act and for the uses and purposes expressed in the act and that the uses and purposes were facilities for neighboring shipyards. In determining the correctness of this conclusion all paragraphs of the act must, of course, be considered, but not one of them has provision for any housing of employees except what houses may be erected on the land and for the employees who should occupy them.

As I have said, the President's order was moved by consideration of the public service. The difference between the Court and me is how the service was accomplished— was it by requisition of the land or the use of the land after requisition?

I think the latter—the Court declares the former. In other words, it was a part of the requisition. Of course, the occupation of the land after the construction of the trolley tracks was as useful, whether the right was acquired and exercised one way as the other—the trolley would be a facility as much in one case as in the other; and to ascribe it to one and not to the other is to give that one a gloss and show that it is denied to the other—a fictitious importance.

I repeat, the difference between the Court and me is one of means—not of effect, and my view is that of the Circuit

Court of Appeals; it is that of the Land & Improvement Company; it is, in essential foundation, that of the Government. These circumstances cannot, of course, obstruct the declaration of superior authority, as this Court is, although the grounds of the exertion of the authority may surprise.  .