## NITRO DEVELOPMENT CO. v. UNITED STATES.

(District Court, S. D. West Virginia. March 28, 1925.)

1. **Courts ☞278—Jurisdiction is determined by allegations of pleadings.**

If the allegations of the petition or declaration state a cause of action within the jurisdiction of the court, that jurisdiction is not affected by failure of proof of such allegations.

2. **Evidence ☞83(1)—Official acts presumed authorized.**

In taking possession of land and using the same in connection with the operation of a government explosives plant during the war, which was authorized by statute, the assistant director in charge will be presumed to have acted with due authority.

3. **Eminent domain ☞2(1), 270—Requisition of land for war purposes in effect condemnation; nature of suit for additional compensation determined.**

The taking of land by the government for war purposes under the Lever Act, § 10 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛ii), is in effect a condemnation, and a suit by the owner for additional compensation above that awarded is not an original action against the United States, but a part of the procedure expressly authorized by said section, and may appropriately be in form an action in assumpsit.

4. **War ☞4—Acts conferring war powers to be broadly construed.**

The war acts, passed to enable the President to conduct the war, should be liberally and broadly construed so as to cover every necessary emergency and necessity.

5. **Eminent domain ☞130—Measure of just compensation for property taken for war purposes, stated.**

Just compensation for property taken by the Executive Department under the powers conferred for war purposes is the fair value of the property when taken, with interest at the legal rate of the state from that time.

6. **Eminent domain ☞270 — Owner of land requisitioned for war purposes held entitled to recover its value with interest as just compensation.**

Where the United States, through the assistant director in charge of an explosives plant operated by the government during the war, requisitioned adjoining land owned by plaintiff, built and used large storage warehouses thereon, maintained guards around the property until long after the Armistice, notified plaintiff that it would condemn the property, and later made an award of compensation under Lever Act, § 10 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛ii), which plaintiff refused to accept, the effect was a taking of the land under the power of eminent domain, which divested plaintiff of the title and vested it in the United States, though condemnation suit was not brought in court, and plaintiff is entitled in proceedings brought under said sec-

tion to recover the value of the land when taken, with interest, as just compensation.

**At Law.** Action by the Nitro Development Company against the United States. Trial by the court, and judgment for plaintiff.

E. B. Dyer and H. D. Rummel, both of Charleston, W. Va., for plaintiff.

Elliott Northcott, U. S. Atty., of Huntington, W. Va., and B. J. Pettigrew, Asst. U. S. Atty., of Charleston, W. Va.

McCLINTIC, District Judge. Plaintiff, a West Virginia corporation, brings this suit to recover from the defendant damages in the way of just compensation for the taking of its 245 acres of land at Nitro, Kanawha county, W. Va., in the year 1918.

The suit is one in assumpsit brought under the act passed by Congress, commonly known as the Lever Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115⅛e–3115⅛kk, 3115⅛l–3115⅛r). Defendant interposed a demurrer to the declaration, which was overruled.

The defendant then filed two pleas challenging the court's jurisdiction in this case, which pleas the plaintiff moved to strike from the record, which motion was sustained.

Plaintiff in its declaration alleges and avers that the defendant in 1918 was the owner, in fee, of 245 acres of land adjoining the Nitro Powder & Explosives Plant, owned and operated by defendant in Kanawha county, W. Va.; that the President, through his agents and officers duly authorized thereunto, did take by requisition plaintiff's said 245 acres of land which plaintiff then owned and which was situated at and adjoining Nitro; that said land was so taken in fee by the defendant for storage for war supplies and other purposes and as part of the permanent plant at Nitro; that said 245 acres was actually taken by defendant into its possession and for its sole permanent use in the late summer of 1918, and at once occupied by the defendant for the purposes aforesaid, and that plaintiff was excluded therefrom; that defendant placed guards on said property, and no one could go thereon without a permit from the defendant; that immediately on taking possession defendant caused to be erected on said land a number of large storage sheds and did store therein large quantities of building material and supplies; that said supplies remained stored on said land until long after the Armistice was declared; that the armed guards were maintained by defendant on said land so taken from the time it was taken until late in the year 1919; that the defendant never officially or otherwise turned said land back to plaintiff; that a short time after the Armistice M. S. Ketchum, assistant director for defendant at Nitro, informed the plaintiff's president that the defendant would not proceed further with the condemnation of said land; that defendant would not need it; that there was created by the President an Appraisal Board, whose duty it was to ascertain damages and pay just compensation for all property taken by the government.

Plaintiff further alleges that it purchased said 245 acres for the purpose of reselling the same as a whole or subdividing the same and selling the lots for profit; that there was great demand for such lots; that said land immediately adjoined the town of Nitro; that said Nitro was a government explosive plant for the purpose of making powder and other explosives; that said land when so taken by the government had a present actual market value of $150,000.

Plaintiff further alleges that in 1920 it did file its claim for just compensation before the War Department Claim Board at Washington, D. C., and that finally the said board allowed plaintiff the sum of $945.85, specifying it was for actual physical damage to said property that had been committed by the defendant; that plaintiff refused said allowance but elected to take from the defendant 75 per cent. of said amount, which was the sum of $709.40; that defendant did on the 22d day of March, 1921, pay to said plaintiff the said 75 per cent. of said amount, which was designated as Award 1861 War Department Claim Board, Appraisal Section; that plaintiff did take said sum, being 75 per cent. of the amount so fixed by the President as just compensation, and did elect and did bring this suit for the residue of just compensation in the sum of $100,000.

## Section 10 of the Lever Act.

"Sec. 10. That the President is authorized, from time to time, to requisition foods, feeds, fuels, and other supplies necessary to the support of the Army or the maintenance of the Navy, or any other public use connected with the common defense, and to requisition, or otherwise provide, storage facilities for such supplies; and he shall ascertain and pay a just compensation therefor. If the compensation so determined be not satisfactory to the person entitled to receive the same, such person shall be paid seventy-five per centum of the amount so determined by

the President, and shall be entitled to sue the United States to recover such further sum as, added to said seventy-five per centum will make up such amount as will be just compensation for such necessaries or storage space, and jurisdiction is hereby conferred on the United States District Courts to hear and determine all such controversies. * * * " Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛ii.

Considering the averments and allegations in plaintiff's declaration to be true, then in the light of the Lever Act, and especially the tenth section thereof, as well, also, other acts of Congress, regarding the exercise of eminent domain, enacted primarily as war measures, and as well also the right of trial by jury and the guaranty of just compensation under the federal Constitution, this court's jurisdiction to try and determine this action cannot be successfully challenged.

[1] The law seems to be settled that if the petition or declaration alleges facts which would be good on demurrer and entitle plaintiff to judgment viewed in the light of the law or statute under which the action is brought, that would be the test of jurisdiction, not whether, at last, the evidence proves the fact. Mere failure to prove the facts by no means shows a want of jurisdiction.

"Jurisdiction always depends upon allegations, never upon the facts. When a party alleges that a certain right is denied him, and the law has given the tribunal power to enforce that right, it must proceed to determine the truth or falsity of his allegation. The truth of the allegation does not constitute jurisdiction. The tribunal must have jurisdiction before it can take any adverse step; its jurisdiction is tested, necessarily, from the allegations, assuming them to be true." Van Fleet Coll. Attack, § 60. United States Supreme Court says in U. S. v. Arredondo, 6 Pet. 709, 8 L. Ed. 547, that if the petition states such a case that on demurrer the court would give judgment for plaintiff, it is an undoubted case of jurisdiction to hear and determine. That is the test. Hawks, Jur. § 3; Wells, Jr. § 4.

The plaintiff and the defendant, in writing, waived trial by jury and agreed that the court should try, hear, and determine this cause in lieu of a jury, which agreement was properly filed in the office of the clerk of this court.

The facts conclusively proven show that plaintiff, Nitro Development Company, did own the 245 acres of land in fee; that it adjoined the then explosive plant at Nitro which was owned and being operated by the government for the manufacture of powder and explosives, and that the defendant was urgently in need of more ground for the extension of its plant, and that M. S. Ketchum was the Assistant Director of the United States Government Explosive Plants, resident at Nitro, in absolute charge of the plant for the defendant; that he had been so appointed by D. C. Jackling, Director United States Government Explosive Plants.

The evidence shows that on December 15, 1917, Newton D. Baker, Secretary of War, issued an order creating an administrative unit of all explosive plants, and appointed D. C. Jackling director, which appointment of said Jackling is as follows:

"Orders: The Secretary of War directs that an administrative unit be created in the office of the Secretary of War for the construction and operation of smokeless powder and other explosive plants. This office will be known as 'United States Government Explosive Plants,' and will be conducted by D. C. Jackling, Director, and Major Seley M. Mudd, Assistant Director."

Subsequently Major Mudd resigned or was transferred to another department, and M. S. Ketchum was appointed Assistant Director in his stead.

On the same date as above, the Secretary of War, in communication to D. C. Jackling appointing him director of all explosive plants, says as follows:

"In appointing you to build and operate the proposed new government powder plants, I wish to say you will be given entirely freehand and full authority in the matter, except where it is necessary for legal reasons that you conform to certain government methods, such for instance as government forms of accounting, which must be followed."

On January 23, 1918, Irving E. Burdick, Esq., attorney at law, New York City, was appointed by D. C. Jackling, acting as director of and in charge of all explosive plants, as general counsel, with specific instructions as to his duties, which included all condemnation proceedings, etc., and on February 15, 1918, Irving E. Burdick, as general counsel, wrote to Messrs. Davis, Davis & Hall, local counsel at Charleston, W. Va., introducing M. S. Ketchum, Assistant Director to Mr. Jackling, and asked that they would confer and advise with Ketchum in regard to matters at Nitro.

Mr. Ketchum states that there was urgent need for more land at Nitro, and he negotiated with plaintiff in regard to its 245

acres; advised them not to sell any lots when they were about ready to proceed with the sales, stating that the government would want the property for its uses. He could not agree on the price with the plaintiff as to its property, and advised the plaintiff through its president that the government would condemn the property, saying that they would take immediate possession thereof, and hoped that plaintiff would not make any objection. The plaintiff said it would not, and early in September of 1918, M. S. Ketchum, as such director, took over the property and at once placed the property under guards of defendant, and material was then moved thereon; storage sheds were built and vast quantities of material were stored on said property. M. S. Ketchum, acting as such director, says that in taking over the land he acted under his superior officers, D. C. Jackling, and Irving E. Burdick as general counsel; that he did nothing without their approval. Mr. Burdick, general counsel, says that he was instructed by the Secretary of War to condemn plaintiff's property, or so much thereof as might be necessary, and he advised Davis, Davis & Hall, local counsel, that the property of the plaintiff would be condemned, and also advised Davis, Davis & Hall to so notify the plaintiff to that effect, which was done by letter.

[2] The proof is clear that M. S. Ketchum did take plaintiff's land for defendant's use, and the proof seems just as clear that he was properly authorized to do as he did, yet if there has been no proof on his authorization, he would be entitled to the presumption that he acted with authority.

In the case of American Railway Co. v. Lindenburg, 260 U. S. 584, 43 S. Ct. 206, 67 L. Ed. 414, decided by the Supreme Court at the October term, 1922, in the opinion rendered by Mr. Sutherland the court says:

"It is a rule of general application that 'where an act is done which cannot be done legally only after the performance of some prior act, proof of the later carries with it a presumption of the due performance of the prior act.'"

[3] It is shown by the evidence that before or just at the time the defendant took over this property, it advised the plaintiff through its president that it would condemn the property and pay therefor. This information was given through M. S. Ketchum to the president of the plaintiff's company.

D. C. Jackling, Director of Explosive Plants, called on the Secretary of War by written letter, asking that $150,000 be allotted by the Chief of Ordnance to purchase the property requested to be taken by Ketchum at Nitro. The Secretary of War requested the Ordnance Department to so allot the $150,000 with which to make such purchases and the Ordnance Department did make such allotment. The $150,000 asked to be and so allotted to make the purchases at Nitro of plaintiff's land included also the purchase of other lands, as some 350 acres of land reported needed by M. S. Ketchum, Assistant Director.

It would seem that this land was acquired, or intended to be acquired, just as the government had acquired other lands at Nitro, for M. S. Ketchum, Assistant Director, in his evidence says:

"The method of handling this tract of land is very much the same as that used in obtaining several other tracts of land during the construction of the plant. The original plant area for which options were obtained by the Dupont Powder Company and turned over to the United States government did not contain sufficient land for all plant purposes. Where possible, additional lands were obtained by agreement, and if the price would not be agreed upon, the land was taken over and the price was determined by court proceedings. In every case where new land was acquired, either by purchase or otherwise, the Assistant Director followed the instructions of the legal department, of which Mr. I. E. Burdick was head, in taking over property and beginning work."

By Act of Congress of April 11, 1918, c. 51, 40 Stat. amending the act passed July 2, 1917, the Secretary of War was specifically authorized to acquire land by condemnation or otherwise to be used for the construction and operation of plants for the construction of nitrates and other compounds, and the manufacture of explosives and other munitions of war, and that this proceeding if by condemnation might be instituted in the name of the United States in any court having jurisdiction of such proceedings for the acquirement by condemnation of any land.

So that the government, by the President, could take the land over as provided by section 10 of the Lever Act, or the Secretary of War could take the land over for the defendant by purchase or by court proceedings by condemnation. In the present case it seems that both procedures were adopted simultaneously. In this case it is clear that there was no purchase, but it is equally clear that the land was taken by the President through the Secretary of War, with full promise and determination to condemn by

court proceedings and pay for the property. It is true no proceedings were ever taken in court, but the proceedings that were adopted and ratified were just as effective for all purposes as if court proceedings for condemnation of the land had been instituted.

While the evidence shows that when M. S. Ketchum first contemplated taking the property over it was to be used for the construction of houses for war workers, as a matter of fact it appears that no houses were ever begun or built on the property except houses for storing war material and war supplies, and that such material and supplies were stored on this property for some months; so reasoning from what was actually done with the property, it seems that there was at least an equal necessity for storage space as for any other purpose, and why no residence buildings were placed upon the property we are left entirely in the dark, as no information is given in the evidence as to why such residences were not erected or begun.

Let us assume that 50 or 100 dwellings, or more, had been erected on this property for the war workers before the date of the Armistice, could not and would not the defendant have claimed title, and would not the law have upheld the title under the facts and law in this case? The initial action of taking and occupancy; the requisitioning. In fact, the exercise of its right of eminent domain by defendant would have been conclusive. It is true no houses were built; but the result in damage to the plaintiff was just as effectual and material as if the land had been covered by houses built by the defendant.

In Filbin Corporation v. U. S. (D. C.) 265 F. 354, it was held:

"Although the word 'requisition' is used, in the opinion of the court the proceeding authorized by section 10 of the statute is in effect a condemnation," etc.

The Filbin Corporation Case was brought to recover just compensation for taking a large body of land by the government.

The recent case of Campbell v. U. S., 45 S. Ct. 115, 69 L. Ed. ——, is, in the manner of taking, identical with the case at bar.

In 1918, the United States, to aid in the prosecution of the war, had determined to build a nitrate plant at Ancor, near Cincinnati, and the government needed more land, and in August of that year, an Army officer, acting under the direction of the Secretary of War, and without obtaining plaintiff's consent, or instituting condemnation proceedings, or making any compensation therefor, took possession of part of plaintiff's land, which was separated from the remainder by a public road, and the court decided, in the suit to recover just compensation, that the taking was under the sovereign power of eminent domain, and the court held that he was entitled to the value of the land taken and the damages inflicted to the residue by the taking, in such sum as would put him in as good a position as he would have been if his property had not been taken.

[4] The Manufacturers' Land & Improvement Co. v. United States Shipping Board Emergency Fleet Corporation, 264 U. S. 250, 44 S. Ct. 314, 68 L. Ed. 664, in effect upholds the principle that while the Emergency Fleet Act gave the President the power to requisition land for building houses, the land could be taken and used for other purposes, and in the opinion the court says: "The act was intended to be susceptible of practical application in varying situations."

In other words, the war acts passed to enable the President to conduct the war should be liberally and broadly construed so as to cover every necessary emergency and necessity.

[5] In the case of Benedict v. United States (D. C.) 271 F. 714, which was a suit brought to recover from the defendant a very large amount of money for real estate taken under section 10 of the Lever Act, the court held that a requisition like a taking by eminent domain is not a taking under agreement, and that acquiescence on the part of the owner was not an entering into of an agreement, and that whether the protest by the owner be made or not there is obligation to pay just compensation, and the court says "that just compensation is the fair value of the property when taken, with interest at the legal rate of the state from that time."

This present action should not be treated as an original suit against the United States. It is simply the completion of an action begun by the United States in the exercise of its right of eminent domain to acquire plaintiff's property by condemnation, and this should be treated as the winding up of that action, and the court in the Filbin Corporation Case very accurately stated just what the proceeding is under section 10 of the Lever Act:

"This proceeding, under section 10, is not an original suit against the United States, to institute which needed express legislative permission. It is a part of the proceeding for condemnation originally instituted by the United States itself, and in which the United States is the actor; this being only the de-

fensive answer of the property holder to assert his right to just compensation. No other interpretation consistent with the Constitution appears a reasonable one."

"It seems to be perfectly clear that the taking and method of ascertainment of value and payment prescribed by section 10 is a condemnation proceeding instituted by the government. The Congress has in one section prescribed an exclusive and complete scheme of condemnation to be instituted by the government. Each successive step prescribed by the statute—the taking, the tentative ascertainment of value, the payment of 75 per cent. of such valuation, the suit by a dissatisfied landowner—is a part of one condemnation proceeding instituted by the United States."

The defendant, impliedly at least, asserts that this was not legal taking; that no one in authority was authorized to act for the President; that Ketchum in so taking and holding, committed a tort, a trespass. This position, in view of the proof and the acts of Congress and the adjudicated cases, is entirely untenable.

The defendant would contest the form of action brought by the plaintiff, that assumpsit would not lie.

There seems to be no prescribed form of action; probably a petition would do. Assumpsit seems to fully cover the situation. The defendant took the land from plaintiff, promised to institute condemnation proceedings, and at the end pay such just compensation to plaintiff as might in that proceeding be ascertained; notwithstanding this promise, no actual court proceedings were taken by defendant, although it just as certainly condemned the land by taking, by requisition through its sovereign power of eminent domain. Then why does not the plaintiff, when full and just compensation, as promised, or, to say the least, impliedly promised, is not paid, have a right of action, on promises—assumpsit?

There is a very potent reason why defendant, at this late day, should not be allowed to claim a trespass, a tort, by its officers and agent.

[6] It is admitted or conclusively proven that the defendant took the land; that it used and occupied the property; that the necessity was imminent for taking the property; that it stored vast quantities of war supplies on the property; that it built storage houses thereon; that it placed guards on said property preventing other people from going on without a government permit; that it promised to condemn and pay a just compensa-

tion for the property; that it heard the plaintiff's claim by petition before its own Appraisal Board, appointed by the President; that it went into details in the ascertainment of damages; that it found plaintiff had been damaged and fixed the damage as some $900; that plaintiff objected to this as a full compensation, but that it did pay the plaintiff something over $700—being 75 per cent. of the award—and that plaintiff was left to its right of action to recover whatever residue it deemed was due it as just compensation.

Then if all of this is true, ought not the law of estoppel apply and the defendant be prohibited from raising the legality of the taking and occupancy of the property?

In the very recent case of United States v. Rogers, 255 U. S. 163, 41 S. Ct. 281, 65 L. Ed. 566, the court says: "Having taken the lands of defendant in error, it was the duty of the government to make just compensation as of the time when the owners were deprived of their property"—citing Monongahela Navigation Co. v. United States, 148 U. S. 317, 13 S. Ct. 622, 37 L. Ed. 463: "In a proceeding to condemn land, the owner is entitled, as part of his just compensation, to interest on the confirmed award from the time when the government took actual possession."

There seems to be no reasonable question why the plaintiff is not entitled to be paid a fair and just compensation for the taking of this land by the government in 1918 at Nitro, and the exact date of taking and entering plaintiff's property by the government is now fixed as the 12th day of April, 1918. The court finds that the evidence is conclusive that defendant did take the plaintiff's 245 acres by its sovereign right of eminent domain; that the taking and condemnation was effected and perfected and concluded as to the whole 245 acres. It is true there is some evidence that plaintiff might not have been in pressing need of all of the 245 acres at that particular time, but it did take all of it, occupied it, used it, and placed guards around and completely excluded the owner therefrom, and therefore is the present owner of the 245 acres, and there is no attempt in the evidence to show that the property was ever reconveyed to the plaintiff, or that the plaintiff was ever by any manner reinvested with title to said property; therefore, it is assumed that the United States of America is the owner of said 245 acres.

The court is compelled to come to this conclusion, as no other in its mind under the law can be reached. Practically all of the

federal decisions since the Armistice dealing with this question have decided that the taking of land by the defendant was the condemnation in itself, and nothing remained but to pay the just compensation to the owner. The Emergency Fleet Case, as before cited, fully bears this out, the Filbin Case cited herein bears this out, and the late case decided by the Supreme Court of Campbell v. United States, 45 S. Ct. 115, 69 L. Ed. ——, seems conclusive on this question, and the taking of the land in that case was identical with the taking in the case at bar.

The still later case of A. W. Duckett & Co., Inc., v. United States, 45 S. Ct. 38, 69 L. Ed. ——, decided by the Supreme Court of the United States on November 17, 1924, was a case where certain terminal docks and warehouses were taken by requisition for war purposes in 1918 for such time as it might be necessary for the government to have the use of the same, and the court decided that a party who had a lease on one of the piers was entitled to just compensation for taking it from him, and in the opinion rendered by Justice Holmes the court says:

"Ordinarily an unqualified taking in fee by eminent domain takes all interest and as it takes the res is not called upon to specify the interest that happened to exist. Whether or not for some purposes the new takers may be given the benefit or privity with the former holder, the accurate view would seem to be that such an exercise of eminent domain grounds a new title and extinguishes all previous rights. * * * In such a case we no more should expect to hear it argued that leaseholds were not to be paid for than that the former fee simple should not be, on the ground that it was gone and a new fee begun."

The only thing, it seems, left undone by the defendant in the case at bar, was the payment of a just compensation for said property.

The proof as to the market value of the land when taken is conclusive to the court's mind by a pronounced preponderance of testimony; that is, that the actual market value of the whole 245 acres when so taken and requisitioned by the defendant on the 12th day of September, 1918, was the sum of $100,000. It is true that the evidence as to the market value varied between $75,000 and $150,000, but from offers made at the time, and from evidence considered the most valuable by which the court could be governed, $100,000 is fixed as the market value of said property as of the 12th day of September, 1918, when the property was actually taken into possession by the defendant, and that the plaintiff is entitled to interest at the rate of 6 per cent. on that sum from that date until judgment herein.

It is uniformly held in West Virginia by the highest court, and in fact by the federal authorities, that the true measure of damages in all condemnation proceedings is the actual value of the property at the time of the taking, with interest until paid. See Compton v. County Court of Marshall County, 83 W. Va. 745, 99 S. E. 85.

"The date of the actual taking [for public use] is that to which reference should be made by Commissioners or Jury in assessing damages." Northern Railway Co. v. Coal Co., 75 W. Va. 423, 83 S. E. 1031.

"Nor is it proper to view the property only from the standpoint of farm values. It has immediately prospective uses for residence purposes, owing to the rapid growth and development of the community where it was situated, and much higher value in market for such purpose than for any other." Id., 75 W. Va. 423, 83 S. E. 1031.

"In an action against the United States, under Act Aug. 10, 1917, § 10 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛ii), to recover just compensation for property requisitioned by the government, 'just compensation' is the fair value of the property when taken, with interest at the legal rate of the state from that time." United States et al. v. Benedict (C. C. A.) 280 F. 76.

Therefore, judgment will be entered for the plaintiff for the sum of $100,000 as just compensation, with interest added at 6 per cent. per annum from the 12th day of September, 1918, to date of judgment (less $709.40 paid by the defendant to the plaintiff heretofore, with like interest from the 22d day of March, 1921), which judgment shall draw interest at the rate of four per cent. per annum until paid.