## UNITED STATES v. MONTGOMERY WARD & CO., Inc., et al.

### No. 44C1611.

District Court, N. D. Illinois, E. D.

Jan. 27, 1945.

Writ of Certiorari Denied March 12, 1945.

See 65 S.Ct. 862.

Charles Fahy, Sol. Gen., of Washington, D. C., J. Albert Woll, U. S. Atty., of Chicago, Ill., Hugh B. Cox, Asst. Sol. Gen., of Washington, D. C., Fowler Hamilton, Sp. Asst. to Atty. Gen., and John P. Frank and Robt. Greenleaf, both of Washington, D. C., for the United States.

Stuart S. Ball, Harold A. Smith, and Winston, Strawn & Shaw, all of Chicago, Ill., for defendants.

SULLIVAN, District Judge.

This is a civil action under the Declaratory Judgment Act of June 14, 1934, 28 U.S.C.A. § 400, brought by the United States against Montgomery Ward & Company, Incorporated, and sixteen of its officers.

This court has jurisdiction of this suit by virtue of Section 24(1) of the Judicial Code, 28 U.S.C.A. § 41(1), and under Section 274(d) of the Judicial Code, 28 U.S.C.A. § 400.

The cause was submitted to the court on the pleadings, affidavits and briefs, and counsel agreed that the hearing was on the merits as well as on the motions for temporary and permanent injunctions and declaratory judgment.

Under authority alleged to have been derived from Section 3 of the War Labor Disputes Act, known as the Smith-Connally Act, 50 U.S.C.A.Appendix § 1503, the President of the United States, by Executive Order No. 9508, dated December 27, 1944, directed the Secretary of War to take possession of and operate the plants and facilities of Montgomery Ward & Company located at Jamaica, New York; Detroit, Dearborn and Royal Oak, Michigan; Chicago, Illinois; St. Paul, Minnesota; Denver, Colorado; San Rafael, California; and Portland, Oregon. On December 28, 1944, the Secretary of War took possession of the plants and facilities described in the Executive Order, and is now in possession thereof. Simultaneously, on December 28, 1944, the complaint herein was filed, wherein the Government asks for a declaratory judgment and decree of this court declaring the rights and status of plaintiff, and more particularly declaring that under the Executive Order of the President issued on December 27, 1944, the Government is in lawful possession of the plants and facilities of the defendant. The complaint also asks that the court enjoin defendants from interfering with plaintiff's possession of such plants and facilities.

In 1940-1941 with the greatly expanded war production program the number of strikes in the country increased rapidly. To meet this situation and to provide for the peaceful settlement of labor disputes while at the same time maintaining the production of material and equipment essential to National defense, the President, on March 19, 1941, by Executive Order No. 8716 established the National Defense Mediation Board with jurisdiction to hear and make recommendations in labor controversies or disputes which might interfere with war production. The National Defense Mediation Board functioned until December, 1941, when it seemed expedient and advisable that it be given additional power. On December 17, 1941, ten days after Pearl Harbor, the President convened at Washington a conference of representative leaders of labor, industry and the public to discuss a national wartime labor policy. It was there agreed and recommended that for the duration of the war there should be no strikes or lock-outs, but that all labor disputes should be peacefully settled by a Board to be established for the adjustment of such disputes. Accordingly, the President, on January 12, 1942, by Executive Order No. 9017, 50 U. S.C.A.Appendix § 1507 note, established

the National War Labor Board, authorized to take jurisdiction, either as a result of certification from the Labor Department or from its own investigation, over such labor disputes as might lead to substantial interference with the war effort; and which could not be settled by collective bargaining or conciliation.

The complaint herein sets out that Montgomery Ward has had a long history of labor disputes which it has refused to settle peacefully by the procedures provided in Executive Order No. 9017 and the War Labor Disputes Act; and the Government insists this course of action interferes with or threatens to interfere with and delay the effective prosecution of the war.

Defendant has filed its answer to the complaint, alleging that the President issued Executive Order No. 9508 on December 27, 1944, for the purpose of enforcing the orders of the War Labor Board, which are only advisory. That the order of the President in this case is illegal and void, and the seizure made pursuant thereto is in violation of the Constitution of the United States. Defendant further urges that no Act of Congress and no power conferred upon him by the Constitution authorizes the President to enforce the orders of the War Labor Board by seizure of its plants and properties.

Plaintiff and defendant have both filed numerous affidavits in support of their respective positions; the case has been argued at length and exhaustive briefs have been furnished to the court.

Montgomery Ward is admittedly one of the largest merchandising organizations in the world. Its business is nation-wide in scope. It sells approximately $600,000,000 worth of merchandise annually to approximately 30,000,000 customers, a large percentage of whom are farmers or live in rural areas. It operates 640 department stores, 190 catalogue mail order offices and 9 mail order houses. Its general administrative offices and a warehouse as well as a mail order division and a retail store, are located at Chicago. It sells building materials, farm machinery, heating apparatus, plumbing supplies, electrical and automobile supplies, repair parts, clothing, shoes, drugs, furniture, hardware, home furnishings, dry goods and parts for military aircraft. At various times it has secured from Government agencies preferences and priorities permitting it to obtain essential materials. It operates three factories, one located at Chicago Heights, which manufactures paints and varnishes. One located at Fort Madison, Iowa, where fencing and fence materials are manufactured; and the Hummer plant at Springfield, Illinois, which ordinarily manufactures farm equipment, but which is presently partly engaged in manufacturing carburetors, propellers and gun mounts to be incorporated in military aircraft, which plant has been in the possession of and operated by the Government since May 21, 1944. None of these factories are covered by the Executive Order. It is admitted that the manufacturing activities carried on by Montgomery Ward are minor compared to its entire business. It is principally engaged in a retail mail order business, selling the wide variety of goods and merchandise set out in the complaint. The business is managed, controlled and directed from the administrative offices in Chicago.

The Government contends that for more than two years Montgomery Ward has refused to adjust labor disputes with its employees on the basis of the directive orders issued by the War Labor Board. That these disputes have many of them resulted in strikes which have interrupted operations in some of Ward's plants and facilities, and that they threaten to stop operations in others, which conditions may spread to other industries which are essential to the war effort, all of which will impede and delay the successful prosecution of the war. Because of this situation the Government insists that the seizure of the plants and facilities of Montgomery Ward was justified under the provisions of Section 3 of the War Labor Disputes Act. The Government further contends, that in the event the court does not find this true, the President is authorized under his general war powers to make such seizure.

The first question for this court to decide is whether the President, under Section 3 of the War Labor Disputes Act, had power to take over and operate the plants and facilities of Montgomery Ward & Company. That section, 50 U.S.C.A. Appendix § 1503, provides:

"Sec. 1503. Power of President to take possession of plants; amendment of section 309 of this Appendix

"Section 9 of the Selective Training and Service Act of 1940 (section 309 of this Appendix) is hereby amended by adding

412

at the end thereof the following new paragraph:

"The power of the President under the foregoing provisions of this section to take immediate possession of any plant upon a failure to comply with any such provisions, and the authority granted by this section for the use and operation by the United States or in its interests of any plant of which possession is so taken, shall also apply as hereinafter provided to any plant, mine, or facility equipped for the manufacture, production, or mining of any articles or materials which may be required for the war effort or which may be useful in connection therewith. Such power and authority may be exercised by the President through such department or agency of the Government as he may designate, and may be exercised with respect to any such plant, mine, or facility whenever the President finds, after investigation, and proclaims that there is an interruption of the operation of such plant, mine, or facility as a result of a strike or other labor disturbance, that the war effort will be unduly impeded or delayed by such interruption, and that the exercise of such power and authority is necessary to insure the operation of such plant, mine, or facility in the interest of the war effort."

■ While in a majority of the cases arising after the establishment of the War Labor Board the parties to labor disputes adjusted their differences on the basis of the decisions rendered by the Board, nevertheless labor disputes and disturbances arose which frequently resulted in strikes. Everyone agrees that strikes in time of war are a serious menace, but more especially if they affect industries engaged in manufacturing or producing goods which are useful or necessary for carrying on the war. Legislation directed solely against strikes would tend only to leave labor at the mercy of employers without solving the labor problem, therefore it seemed imperative that some method be provided for settling war labor disputes in an orderly manner which would be fair to everyone concerned. Apparently, to meet this situation, Congress, on June 25, 1943, enacted the War Labor Disputes Act, under which the War Labor Board previously created by Executive Order of the President, and composed of representatives of employers, employees and the public, was authorized to hear and decide all labor disputes which might ultimately lead to substantial interference or threatened interference with the prosecution of the war. It appears that during the past two and one-half years the War Labor Board has considered numerous labor disputes between Montgomery Ward and its employees, and has issued directives which the Company, in practically every instance, has refused to obey, consequently resulting in strikes. The Board has no power to enforce its decisions and there is no statutory authorization for review of its orders. Employers Group of Motor Freight Carriers, Inc., v. National War Labor Board, App.D.C., 143 F.2d 145, 147, where the court said: "No one threatens, and no one could maintain, either judicial or administrative proceedings against the appellants upon the authority of the Board's order."

The Court of Appeals in this case concluded its opinion by saying that action of the Board would be "informatory and 'at most, advisory.'" The Supreme Court denied certiorari in this case. 65 S.Ct. 72. The War Labor Disputes Act, however, provides that the President may take possession of "any plant, mine, or facility equipped for the manufacture, production, or mining of any articles or materials which may be required for the war effort or which may be useful in connection therewith," after he has investigated and found that there is "an interruption of the operation of such plant, mine, or facility as the result of a strike or other labor disturbance, that the war effort will be unduly impeded or delayed by such interruption, and that the exercise of such power and authority is necessary to insure the operation of such plant, mine, or facility in the interest of the war effort."

■ I have carefully considered the War Labor Disputes Act, and applying all of the standards by which its constitutionality may be tested, I am of the opinion that it is constitutional. Under the Act the President is authorized to take over any mine, plant or facility which is *equipped* for the manufacture, mining or *production* of any article or material necessary or useful in the war effort, providing the conditions of the statute are met. The question which now confronts me is whether the President is given power under this statute to take possession of an establishment which is engaged solely in retail selling and distribution.

■ "Production" and "distribution" are not synonymous terms. The Appleton

Century Dictionary, edition of 1933, defines the noun "production" as "The act of producing, or the state of being produced; creation; manufacture." And the verb "produce" is defined as "to bring forth, bear or yield, as young, or natural products; give forth, furnish, or supply, as a mine producing silver; to bring into existence, give rise to, cause or make, (as to produce steam, heat, a result, or a noise); make by working upon raw material, or manufacture." Webster's New International Dictionary, Merriam's Edition of 1941, defines "production" as "act or process of producing, bringing forth, or exhibiting to view; as the production of commodities." "Produce" is defined as "to bring forth, as young, or as a natural product or growth; to give birth to; to bear; generate; yield; furnish, as the earth produces grass; trees produce fruit." "To give being or form to; to manufacture; make; as he produces excellent pottery." In any dictionary I have consulted I have not found "*production*" defined so as to include "*distribution*." The Government has cited cases which it contends indicate that the term "production" has a broader significance than that customarily given to it, defining it as "to make available," but it seems to me that none of those cases justify the application of the term to facilities whose sole business is that of retail sale and distribution. Seizure of plants and facilities of all kinds is not authorized by the Act. Under its provisions possession may be taken only of "plants and facilities which are *equipped* for the mining, manufacture or *production* of articles or materials which may be required for the war effort or which may be useful in connection therewith." In support of its contention the Government cites the cases of Manufacturers' Land & Imp. Co. v. United States Shipping Board Emergency Fleet Corporation, 264 U.S. 250, 44 S.Ct. 314, 68 L.Ed. 664, and Briggs Mfg. Co. v. United States, D.C., 30 F.2d 962. In the case of Manufacturers' Land & Imp. Co. v. United States Shipping Board Emergency Fleet Corporation, the court held, quoting from the syllabus: "The Act of March 1, 1918, * * * empowering the United States Shipping Board Emergency Fleet Corporation to requisition land for the construction thereon of houses for employees, and the families of employees, of shipyards in which ships were being constructed for the United States, and to construct on such land for their use houses 'and all other necessary or convenient facilities', etc., authorized the taking of land for an electric railway terminal, for the purpose of providing convenient transportation for employees of a nearby shipyard, and their families, for whom housing was being provided under the act on other land in close proximity."

In Briggs Manufacturing Co. v. United States, the court held, quoting again from the syllabus: "Articles produced by cotton mill held to have contributed to prosecution of war, and enumerated facilities of such mills, including tenement houses for additional help, icehouse and furnace for head weaver's house, were for production of articles contributing to prosecution of war, within Revenue Act of 1918 * * relative to deduction in computing income for amortization of cost of acquired war facilities."

Both of these cases involved facilities the operation of which were held to be necessary or useful in the war effort, and might be applicable here if the War Labor Disputes Act authorized the President to take over facilities the operation of which are necessary or useful in the war effort, where that operation is being interrupted by a labor dispute. But that is not the question involved in the instant case. The War Labor Disputes Act authorizes the President to seize a plant or facility only when it is *equipped to produce* articles necessary or useful in the war effort.

The Government further urges that the Act taken in its entirety authorizes the President to seize the plants and facilities of Montgomery Ward & Company. The War Labor Disputes Act is not an integrated piece of legislation. It covers five distinct subjects all related, but each separate and distinct. Section 3 is the plant seizure section. It is referred to as an amendment to section 9 of the Selective Training and Service Act. Section 9 of the latter Act, 50 U.S.C.A.Appendix § 309, provides for the seizure of property where the Government had placed an order for the manufacture and production of munitions of war and there had been a refusal on the part of a contractor to comply with the order. The placing of the order and the refusal to deliver war materials were definitely prerequisites to seizure. Section 3 of the War Labor Disputes Act enlarges upon Section 9 of the Selective Training and Service Act by providing that the President may seize "any plant,

mine, or facility equipped for the manufacture, production, or mining of any articles or materials which may be required for the war effort or which may be useful in connection therewith." The placing of an order and refusal upon the part of a contractor to fulfil such order are not prerequisites to seizure under Section 3. Sections 4, 5 and 6 of the Act, 50 U.S.C.A. Appendix §§ 1504–1506, refer to conditions of employment in plants seized under Section 3 and provide penalties for interference with the operations of the plant while under Government control. Section 7 of the Act, 50 U.S.C.A.Appendix § 1507, deals with the functions and duties of the National War Labor Board. This is the section which for the first time gave statutory recognition to this Board. It clothed the Board with certain authority, including subpoena power. Specifically, Congress required that the Board in its decisions conform to the provisions of the Fair Labor Standards Act, the National Labor Relations Act, 29 U.S.C.A. § 201 and 151 et seq., and the Emergency Price Control Act, 50 U.S.C.A.Appendix § 901 et seq. Section 8 of the Act, 50 U.S.C.A.Appendix § 1508, provides for the thirty day "cooling off" period before a strike shall begin. It also provides for notices of contemplated strike and for secret elections. Section 9, 50 U.S.C.A.Appendix § 1509, amends the Corrupt Practices Act and forbids labor organizations from soliciting contributions in connection with Federal elections.

■ The most severe part of the Act is the plant seizure section. It is inconceivable that Congress would exercise so much care in clarifying Section 8 and leave Section 3 (the plant seizure section) to conjecture. It is obvious that Congress had but one reason for not enlarging upon the terms "plant, mine, or facility equipped for the manufacture, production, or mining of any articles or materials" which may be required for the war effort, and that is that the language is too clear to require definition. Nor was any provision made for enforcing the orders of the War Labor Board, Congress apparently believing, and so saying, that seizure would be necessary only in cases where the employer's facilities were *equipped* for manufacturing, mining or *producing*. Section 8 provides for the "cooling off" period and applies to controversies which seriously threaten to interrupt the war production, but I do not believe that the language used in Section 8

warrants my construing Section 3 as if the the same terms were used in both. I have carefully read the entire legislative history of the Act and from it I cannot draw the conclusion that the terms *"equipped to manufacture, mine or produce,"* also include the term "distribution" or that Congress intended by the Act to grant to the President the power to seize a plant or facility engaged solely in retail *"distribution."* In the case of Ex parte Mitsuye Endo, 65 S.Ct. 208, 217, the court said: "We must assume that the Chief Executive and members of Congress, as well as the courts, are sensative to and respectful of the liberties of the citizen. In interpreting a war-time measure we must assume that their purpose was to allow for the greatest possible accommodation between those liberties and the exigencies of war. We must assume, when asked to find implied powers in a grant of legislative or executive authority, that the lawmakers intended to place no greater restraint on the citizen than was clearly and unmistakably indicated by the language they used."

■ I am of the opinion that the War Labor Disputes Act did not confer upon the President power to seize the plants and facilities of Montgomery Ward & Company, a retail establishment engaged solely in distribution.

On April 25, 1944, a dispute then being in existence between Montgomery Ward and a local Union at its Chicago plants and facilities, the President issued an Executive Order authorizing the Secretary of Commerce to take possession of and operate Ward's Chicago facilities. Application was made by plaintiff for a restraining order followed by a motion for a temporary injunction. The case was heard and taken under advisement by the Court, but was dismissed because the Government surrendered possession of the Ward property.

■ I come now to the second question: Whether the President independently of action by Congress has inherent power under the Constitution which authorizes him to make such a seizure as the one here in question.

Article II, Section 2, of the Constitution provides: "The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States."

As Commander in Chief the President directs the activities of the armed forces. He has extensive authority over persons and property in the field of military operations. It is his responsibility to see that the armed forces are moved, housed, clothed and fed, and furnished with arms, supplies, and all implements of war; and there is no doubt but what in emergency he may seize arms, supplies, food, clothing, transportation facilities and all implements of war to the extent of the needs of the armed forces. In military crisis, when Congress is not in session, the President has power to do many things found necessary for the preservation of the Government. When Congress is in session, but when the emergency is so great that the national safety would be imperiled before Congress could act, the power resides in the President, as a function of his military office, to do the things necessary to preserve the Government, but which it would not be lawful for him to do except for the emergency. An illustration of the use of this power is the seizure under Executive Order of the President of the bituminous coal mines during the strike in 1943; and the seizure of railroads and telegraph lines by President Lincoln after Fort Sumter was fired upon at the opening of the Civil War. The military necessity for action taken in the theatre of war will not ordinarily be inquired into by the courts, but outside the theatre of war the President, as Commander in Chief, does not have unlimited power over the persons and property of citizens. He may not seize private property just because it might be useful or beneficial to the armed forces. In a war emergency he may seize a particular railroad when military necessity requires its use for the movement of the naval or military forces of the United States and their supplies and equipment; but he may not, without authority from Congress, lawfully seize all of the railroads of the country immediately war is declared. If Montgomery Ward's plants and facilities were located within the actual theatre of military operations, and its goods were necessary and essential for the use of the naval or military forces, then the Commander in Chief might lawfully take possession of them. But the armed forces, so far as we know, being adequately supplied and equipped, and Montgomery Ward's plants and facilities being far removed from the scene of actual military activities, those plants and facilities may not be seized by the President simply because at some future time, on account of the existence of a labor dispute between it and its employees, Montgomery Ward may not be able to deliver supplies deemed necessary or useful to the war effort.

In Mitchell v. Harmony, 54 U.S. 115, 134, 13 How. 115, 14 L.Ed. 75, cited by both sides in this controversy, Harmony, who was a trader, during the Mexican War followed the army in its invasion of enemy territory. When Harmony decided to go no further, Colonel Mitchell, under orders, detained him and seized his wagons, mules and goods. Harmony brought action for trespass against Colonel Mitchell, claiming that the seizure was illegal. The Supreme Court upheld a verdict in Harmony's favor, saying: "There are, without doubt, occasions in which private property may be lawfully taken possession of or destroyed to prevent it from falling into the hands of the public enemy; and also where a military officer, charged with a particular duty, may impress private property into the public service or take it for public use. * * * But we are clearly of opinion, that in all of these cases the danger must be immediate and impending; or the necessity urgent for the public service, such as will not admit of delay, and where the action of the civil authority would be too late in providing the means which the occasion calls for."

In United States v. Russell, 80 U.S. 623, 628, 13 Wall. 623, 20 L.Ed. 474, during the Civil War three steamers belonging to Russell were seized and used for the transportation of military freight. Russell brought suit in the Court of Claims. The Supreme Court pointed out that the transports were impressed for the purpose of enabling those in command of a military post to maintain their position, the court saying: "Where such an extraordinary and unforeseen emergency occurs in the public service in time of war no doubt is entertained that the power of the government is ample to supply, for the moment the public wants in that way to the extent of the immediate public exigency, but the public danger must be immediate, imminent, and impending, and the emergency in the public service must be extreme and imperative, and such as will not admit of delay or a resort to any other source of supply, and the circumstances must be such as imperatively require the exercise of that extreme power in respect to the particular

property so impressed, appropriated, or destroyed."

In the Prize Cases (The Amy Warwick), 67 U.S. 635, 670, 2 Black. 635, 17 L.Ed. 459, ships belonging to the citizens of states which were in rebellion against the Federal Government were seized for running a blockade instituted by the President. The court decided that the President had the right, without an Act of Congress, to proclaim a blockade if a state of war in fact existed; that the court accepted the President's proclamation of a blockade as "conclusive evidence" that a "state of war existed which demanded and authorized a recourse to such a measure;" that Congress had ratified the act of the President; and that the citizens of a state in rebellion were "enemies" whose property was subject to capture on the high seas as a prize.

In United States v. McFarland, 4 Cir., 15 F.2d 823, 826, the court said: "the President, as Commander-in-Chief of the Army and the Navy, doubtless had the constitutional power in war time, in cases of immediate and pressing exigency, to appropriate private property to publc uses; the government being bound to make just compensation therefor." Citing cases among them Mitchell v. Harmony.

In commenting on Mitchell v. Harmony the Circuit Court of Appeals said that the case showed "how careful the courts are to restrict the exercise of this power within narrow bounds."

The Constitutional guaranties that protect the sacred rights, liberties and property of American citizens, from the humblest to the most exalted, still remain inviolate. These rights may not be transgressed with impunity nor be disregarded because of expediency; neither may they be abridged or suspended, even for a single moment, except in the manner and under the circumstances specifically provided by law.

I am of the opinion that the President was without authority, either under Section 3 of the War Labor Disputes Act, or under the war powers conferred upon him by the Constitution as Commander in Chief of the Army and Navy to take possession of the plants and facilities of Montgomery Ward & Company.

It is with considerable reluctance that I have arrived at the conclusions in this case. Our Nation is engaged in a global war, and it is imperative that we contribute everything we have to insure its speedy and successful conclusion. Millions of young Americans are fighting and dying on all of the battlefields of the world, and thousands of families are daily saddened by the heartbreaking news that their loved ones have made the supreme sacrifice. Our hospitals are filled with maimed and wounded, physically and mentally ill, who are back from the war. Our country is in a great crisis and our liberty and very existence are at stake. So deeply do I feel on this subject that I believe it is not too much to expect that for the duration employers, employees and Unions on the home front should make a determined effort to adjust their labor disagreements without resorting to strikes and lock-outs. Selfishness, arrogance, intolerance of the rights of others, self-interest and unwillingness to compromise should, during this emergency, be all subordinated for the common good. It may well be that an interruption at this time in the flow of any goods may directly or indirectly affect our armed forces, thereby resulting in added loss of life or in prolonging the war. As good American citizens none of us want that to happen. The peacetime privilege of engaging in prolonged labor disputes should be voluntarily suspended for the duration. A tribunal has been established to accomplish peaceful settlement of labor disputes during the war emergency. Loyalty to our country and our fighting forces should influence disputants in such labor controversies to refrain from waging a campaign against the use of this machinery, but rather should lead them to make every effort to fairly present their disputes before this tribunal and then be guided by its recommendations, even though no method is provided for the enforcement thereof. If the disputants are not willing to obey the recommendations of the War Labor Board, which are admittedly only advisory, then Congress alone is the only branch of the Government which can compel them to do so. It is the duty of Congress to enact the laws, and the duty of the courts to interpret them.

Plaintiff's petitions for temporary and permanent injunctions and declaratory judgment are denied, and the complaint is dismissed.