George S. Mawhinney, Plaintiff, *v.* Millbrook Woolen Mills, Inc., Defendant.

(Supreme Court, Richmond Trial. Term, November, 1918.)

Constitution of the United States, article II, section 2 — powers of president of the United States as commander-in-chief of army and navy recognized by usages of war — contracts.

Contracts — performance of — in action to recover damages for breach of — when, with United States war department have no precedence — pleading — evidence — when motion to dismiss defense and for judgment granted — National Defense Act, section 120.

By virtue of section 2 of article II of the Constitution the president, as commander in chief of the army and navy, has all the powers recognized by the usages of war, but when he does not act by martial law, he is governed by the acts of congress, and executive orders not authorized thereby are no warrant of power or cover of protection.

While contracts made by government department heads with private parties are presumed to be by authority of the president still in the performance of such contracts, even for military

supplies, precedence over civilian contracts does not necessarily inhere, nor may it be imported or imposed otherwise than by an act of Congress.

Where in an action to recover damages for breach of contract to deliver a certain quantity of woolen cloth, deliveries of which were to begin in May, 1917, and be completed early in November, defendant pleaded that by reason of certain contracts with the United States war department performance of the contract in suit was impossible, and irrespective of section 120 of the National Defense Act of June 3, 1916, it appears that the contracts with the government had no preference, nor did they have it under said statute, and it further appears that the only order given by the war department referring to such statute and asserting preference thereunder over all prior contracts with others was not given until November 24, 1917, the defense fails.

Though the government officials, from time to time, had urged all possible speed and promptness in deliveries but had not required precedence for their orders under the Federal statute, the defense pleaded was without foundation and a motion to strike out testimony tending to establish it and the motion to dismiss said defense and for judgment in favor of plaintiff will be granted.

THIS action is brought to recover damages claimed to have been suffered by reason of defendant's failure to fully perform its contract to deliver one hundred pieces of woolen cloth, containing about 5,000 yards at one dollar and seventy-five cents per yard. Deliveries, under the contract, were specified to be made in May, June and July, 1917, and ten pieces were delivered, but, by reason of letters written by plaintiff to the defendant, the time for the delivery of the remaining ninety pieces was extended until the latter part of October or the early part of November.

The defense, generally stated, is that performance of the contract with plaintiff became impossible because certain contracts of the defendant with the United States war department had precedence inherently, and also because precedence was spe-

Misc.]　　　　　Supreme Court, November, 1918.

cially required by section 120 of the act of Congress of June 3, 1916 (The National Defense Act); and by orders placed by the executive officers of the government. The first of these contracts was dated May 11, 1917, and called for 200,000 yards. Another contract, made about July twenty-seventh, required 100,000 yards, another, about August twenty-fifth, 360,000 yards, and another, about November fifth, 380,000 yards, all at three dollars and fifty cents per yard. These contracts were the result of a visit by the defendant's treasurer to the war department. In May, he saw Col. Penrose, of the quartermasters department, at Washington, and told him of the qualities and benefits of defendant's product, reworked wool, and advised its use as a substitute for the more costly virgin wool, in the making of military uniforms and supplies. He says that Col. Penrose asked him to undertake contracts, and that he replied that he could not because of commitments to the civilian trade, and was asked, " Don't you know that the Government comes first? " He testified that he told Col. Penrose that they would have to be protected, and that Col. Penrose said "All right, we will give you authority on it. You proceed and you will have a letter that you will have to give the Government precedence in deliveries." He was asked " Did he say anything about in regard to whether you would have to do it, or not, to take the Government orders, or anything of that kind? A. Col. Penrose said that later on, ' If you don't take it now, you will have to take it.' Q. He told you that that time? A. At that time, he said ' The mills will have to go in sooner or later.' " There was no evidence introduced that the mills of the nation generally were ever ordered to undertake governmental work. The defendant's contracts with the war department were introduced. They are drawn on

" Q. M. C. Form No. 105. Revised Form approved November 30, 1914." The evidence introduced also included certain letters to the defendant from various government officials. First one of June sixteenth, from Lieut. Col. Williamson, depot quartermaster, at Boston, which stated that there should be no delays in deliveries, and that wherever it was possible, such should be speeded up or anticipated. It also contained the general statement that " Orders from the Government always take precedence " and requested the defendant, to that end, to employ all available machinery and means. On July second the committee on supplies, of the council of national defense, established by the National Defense Act, sent another letter, at the suggestion of Col. Zalinski, depot quartermaster, at Philadelphia, as the " customary communication." It expressed a desire for prompt delivery, and that the defendant defer, if necessary, interfering commercial commitments. On July twenty-third Col. Zalinski wrote, insisting upon the signature by the defendant of the first governmental contract, which was dated May eleventh, but had not yet been signed by the defendant, though it had proceeded with work under it. In this letter it was stated that unless the defendant signed the contract with a labor, or strike clause " agreeable to the War Department, an order (as per the enclosed form) will be placed with you, which would provide for the Government to take control of your plants under Section 120 of the National Defense Act." There were also letters from Captain Poole, assistant to the district quartermaster at Boston, one demanding promptness in deliveries, without mention of precedence, and the other stating that the Government " should be given preference and precedence." On November twenty-fourth the defendant received the following:

" To the MILLBROOK WOOLEN MILLS, INC.,

"" 215 Fourth Avenue,

"" New York, N. Y.:

" GENTLEMEN.— The President of the United States, by virtue of and pursuant to the authority vested in him, and by reason of the existing emergency requiring such action for the national security and defense, does hereby requisition for public use connected with the common defense, and hereby places an order with you for the following necessary supplies:

" (a) All cloth in your possession now ready for delivery to the United States Government.

" (b) All cloth now in process of manufacture by you for the United States Government, the same to be completed to conform to the requirements of your contract.

" You are further directed to utilize all machinery under your control exclusively in the production of cloth contracted for the use of the Government, and, as required by Section 120 of the Act of June 3, 1916 (39 Stat. 213), you are hereby required in filling this order to give preference thereto over all work for parties other than the United States Government without regard to the order or date of contracting therefor.

" Kindly acknowledge receipt hereof.

"" Very respectfully,

"" NEWTON D. BAKER,

"" *Secretary of War.*"

At the opening of the trial, plaintiff moved to dismiss the several defenses, setting up the substance of the foregoing, as insufficient in law, and at the close of the trial, moved that defendant's evidence be stricken out, and also renewed the motion to dismiss. Jury trial was waived.

. Supreme Court, November, 1918.          [Vol. 105.

Thomas G. Prioleau, for plaintiff.

Herbert C. Smyth, Nathan Kalvin and Roderic Wellman, for defendant.

KELBY, J.   Plaintiff urges that certain allegations of the answer import the admission that the contracts with the government were voluntary on the part of the defendant. The admission might be conclusive (*Horan* v. *Hastorf,* 223 N. Y. 490; *Fullerton* v. *Northern Bank,* 184 App. Div. 37), but it is doubtful whether, as a matter of pleading, there is the admission.   In testifying the defendant repudiates the idea that the contracts were voluntary, but the evidence tends to establish the fact.   It is certain that defendant voluntarily introduced, and recommended, to the government the use of its product, and had little, if any, reluctance about entering into contract relations, and, in fact, at once did so.   The withholding of its actual signature to the first contract, it claims was, in part, because precedence for the government was not in terms provided for.   This, as well as the claim that defendant only yielded when the government '' sent us a letter and told us unless we forthwith would sign that contract, we would be put in jail,'' is hardly borne out by the evidence.   The letter referred to, which is that from Col. Zalinski, of July twenty-third, is not so arbitrary or coercive, and defendant's letter of July twelfth, which evoked it, and might further have explained it, defendant did not introduce.   Apparently the controversy, and the insistence were on subject of the '' strike clause,'' and not about the silence of the contract on the subject of precedence.   Acceptance of the contract, was, in that respect voluntary on the part of the defendant.   It does not seem necessary to hold more than this.   The defendant's contention is that

" whether or not voluntary in their inception " the
contracts were mandates from the government.  This
is urged as independent of the provisions of the
National Defense Act, and the argument, in support,
is that the acts and contracts of governmental depart-
ment heads are presumed to be by authority of the
president, and where the executive acts, no statute is
necessary, authority being in the Constitution, article
II, section 2, making the president commander-in-chief
of the army and navy.  The decisions cited (*Runkle*
v. *United States,* 122 U. S. 543; *Wilcox* v. *Jackson,*
13 Pet. 498; *United States* v. *Eliason,* 16 id. 291), sup-
port the proposition of presumptive authority, but
not the defendant's theory of executive power, which
is in law, much narrower than the theory assumes.
In *Little* v. *Barreme,* 2 Cranch, 170, it was held by the
United States Supreme Court that instructions from
the president to an American commander to seize
vessels in enemy trade, otherwise than as provided by
act of congress, did not justify the officer, nor exempt
him from the payment of damages.  In *Milligan* v.
*Hovey,* 3 Biss. 13, it was held that the members of a
military commission, and officers of the army acting
thereunder, were liable in damages for arrest and
imprisonment ordered by them, where the appoint-
ment of the commission was otherwise than as pro-
vided by act of congress.  In *Hendricks* v *Gonzalez,*
67 Fed. Repr. 351, it was held that it was no justifica-
tion for refusing clearance to a vessel, intended for
insurrectionary use in a friendly country, that the
refusal was under instructions from the secretary of
treasury, but not authorized by congress.  The rule
thus is that while the president, when acting as com-
mander-in-chief, has all the powers recognized by the
usages of war, but when he does not act by martial
law, he is governed by the acts of congress, and execu-

tive orders, not authorized thereby, will be no warrant of power, or cover of protection. The present case is not a question at all of martial law. Martial law and civil law have not in this country lost their identity, and while it cannot be gainsaid that what was said in this case to the defendant, and what contracted with it, was military in spirit, and in eventual purpose, it was civil in its essential character. I conclude therefore that in the performance of contracts with the government, even for military supplies, precedence over civilian contracts does not necessarily inhere, nor may be imported or imposed otherwise than as provided by act of congress. This conclusion is not hampering to national efficiency in the difficult exigencies of war, for congress has in fact enacted a statute, providing for precedence, where the executive deems it necessary, and this statute is not complained of, in this case, or out of it, so far as I know, as wanting in scope and effectiveness.

This is section 120 of the National Defense Act as follows: " The President, in time of war or when war is imminent, is empowered, through the head of any department of the Government, in addition to the present authorized methods of purchase or procurement, to place an order with any individual, firm, association, company, corporation, or organized manufacturing industry for such product or material as may be required, and which is of the nature and kind usually produced or capable of being produced by such individual, firm, company, association, corporation, or organized manufacturing industry. Compliance with all such orders for products or material shall be obligatory of any individual, firm, association, company, corporation, or organized manufacturing industry, or the responsible head or heads thereof and shall take precedence over all other orders and

contracts theretofore placed with such individual, firm, company, association, corporation, or organized manufacturing industry.''

The determinative inquiry therefore in the case is whether precedence was contracted for, or ordered, in pursuance of this statute. It goes by the saying that it should be broadly construed, with its terms and implications undiminished. But it is not to be overlooked that there is not to be found in it any declaration of inherent right, or general right, to precedence in governmental contracts. No express declaration certainly, nor any reasonably sure implication, calls for the conclusion that such was intended. The statute is not self-executing. In terms it is only where the government shall '' place an order '' that by force of the statute '' such order '' is '' obligatory '' and given precedence '' over all other orders '' with penalties prescribed for refusal.

It is suggested, in a tentative way, that the making of a contract is, '' in ordinary parlance '' the '' placing of an order.'' It is probably so in commercial colloquialism, and an overlooked instance is in the contract upon which plaintiff sues, and which states the conditions under which '' this order is placed.'' But congress did not have the colloquialism in mind. Resort to the presumption against loose verbal usage in the interpretation of a solemn statute, is not needed. Explicitly and repeatedly it is made manifest that orders placed under the statute are to be something extraordinary, something '' in addition to the present authorized methods of purchase and procurement.'' The very terms bar the inference of an intent to include a purchase by ordinary contract as being the placing of an order under the section. The contracts here were ordinary contracts, negotiated and closed in pursuance of an ordinary and established method

of governmental purchasing. " Revised in November, 1914 '' they were on their face, a form authorized and existing, not only before the passage of the act of congress, but before any one except perhaps the most far-sighted could have anticipated our embroilment in the war, and, proceeding from form to substance, they contain no reference to the National Defense Act, or the national defense power, nor any covenant, proviso, or demand in terms importing a right to precedence in performance.   Nor are the contracts in that respect added to, by the various orders, writings and expressions of the governmental officials.   It is urged as to these, that there was no restriction by the National Defense Act, to any stereotyped form of order, and that an order might be placed under the form and terms of polite request.   Agreed.   The decision of Judge Ray, of the United States District Court, in the case of *Moore & Tierney* v. *Roxford Knitting Co.,* 250 Fed. Repr. 278, earnestly cited by the defendant, holds this, but as I read it, holds no further than this, as matter of law, though it did find that what was done in that case constituted, as matter of fact, the actual placing of an order.   In form the government requested supplies, but expressly said that no refusal would be heeded; the iron hand was in the velvet glove.   The decision does not support, nor do I accept, the argument that since defendant was presumed to know that the government could commandeer its plant, the various requests for precedence, envisaged with the power to compel acquiescence, showed what would be attained by exercise of the power if denied or obstructed, and so were a form of order.   Some of the vigor of this argument seems to depart when it is seen how equally available it would be to a party, willing to exploit its possibilities of war profits, with intended evasion

or downright violation of his civilian contracts.  The National Defense Act holds no purpose to wantonly disrupt or destroy the regular course of business, upon which endurance and success in war, may ultimately depend, and congress has sufficiently indicated that in placing an order the action of the government is to be manifested in definite form.  The assumption should be against the exercise of the extreme power, under section 120, until it clearly appears that it was intended to be exercised.  The power to commandeer, it has been said, is a power to be resorted to only where public danger is " immediate, imminent and impending," the emergency giving the right.  *United States* v. *Russell,* 13 Wall. 623, 627.  More sheer and abrupt than the power to take by eminent domain, it is· as well to be said of it that while an essential attribute of sovereignty, it is arbitrary in character, and so subversive of private rights, that its exercise should not be based upon ambiguous language, equivocal action, or doubtful inference.  *Western Union Tel. Co.* v. *Pennsylvania R. R. Co.,* 195 U. S. 540.  The official urgings and admonitions, in evidence, are to be regarded as indicating no more than a commendable desire for speed in the contracted deliveries, largely by appeal to defendant's patriotic motives, but not changing the character of the contracts from ordinary civil contracts.  If the officials may be deemed to have entertained an enlarged or mistaken view of their power, the answer is that departmental construction is not to be resorted to unless a statute be doubtful or ambiguous and, as before pointed out, erroneous departmental construction, even by the executive itself, cannot over-ride the statute. or protect from civil or personal liability. And, in truth, the official departmental construction is against defendant.  That, on July 23, 1917, the

threat was made to place an order, pursuant to the statute, coupled with the fact that, thereafter, on November twenty-fourth, an order was actually placed, coming indisputably within its provisions, establishes that nothing which had gone before was intended to be an order under section 120, or was so construed, or was so construable. This undoubted order of November twenty-fourth, however, constitutes no defence, for it was placed after the time for the deliveries to plaintiff, both as originally specified and as extended. Upon receipt of this order, the defendant sent notice of cancellation of plaintiff's contract, but that there was a right to cancel, in the circumstances, is not contended, the actual contention being that performance of the contract with plaintiff was impossible. As to this defendant overstates the rules when it says that impossibility of performance arising from acts of the legislature and executive branches of the sovereignty, is an excuse for a contract breach. Reference to the authorities cited in support (*United States* v. *Dietrich,* 126 Fed. Repr. 671; *People* v. *Globe Mutual Life Ins. Co.,* 91 N. Y. 171, 176; *Jones* v. *Judd,* 4 id. 411; *Labaree Co.* v. *Crossman,* 100 App. Div. 499, 502; affd., 184 N. Y. 586; *Gesualdi* v. *Personeni,* 128 N. Y. Supp. 683; *Adler* v. *Miles,* 69 Misc. Rep. 601) shows that they were cases really enforcing the true rule which is that, where performance of a contract, *legal when made, becomes illegal,* by some event, statute, decision, or lawful act of public authorities, both parties are excused from further performance. Here, without an order placed under the National Defense Act, the effect of the contracts with the government was simply a rush of business, which is not an excuse. L. R. A. 1916, F. 18. Performance may have been impeded, misunderstood or unwarranted claims of precedence, or may have been made more difficult in

concurrence, or convenience, with the government contracts, but all this is not enough. Where a party by his contract creates a duty or charge upon himself, its very essence is an ability to perform, and he is bound to make it good. Legal excuse requires that the thing cannot by any means be effected, because of " the act of God, the law or the other party " (*Carnegie Steel Co.* v. *United States,* 240 U. S. 156, 165; *Jacksonville, etc., R. Co.* v. *Hooper,* 160 id. 514), or because of the happening of something which has frustrated the entire design on which was grounded the promise. *Marks Realty Co.* v. *Hotel Hermitage Co.,* 170 App. Div. 484, 485.

A generally apposite case is *Graves* v. *Miami S. S. Co.,* 29 Misc. Rep. 645. It was there held that a contract of affreightment was not abrogated by the declaration of war between the United States and Spain, and that it was no defense that sailings were discontinued because the carrier had disposed of its charter to the government. It appeared that such disposition was both voluntary and profitable and I think the evidence establishes the like conclusion in the present case. The court said, " Performance of the contract might have been excused had the United States government, in the exercise of the power of eminent domain, seized the defendant's vessels  *  *  *  Governmental compulsion might have excused performance; the voluntary act cannot."

The plaintiff's motions to strike out the testimony and dismiss the defenses and for judgment are granted. I find that the market value of the woolen goods due plaintiff was $4 per yard, and that on the basis of fifty yards, in each of the ninety pieces, his damage is $10,125.

Ordered accordingly.