**ALPIRN et al. v. HUFFMAN et al.**

No. 435 Civil.

District Court, D. Nebraska,
Omaha Division.

April 2, 1943.

John C. Mullen, of Omaha, Neb., for plaintiffs.

Joseph T. Votava, U. S. Atty., of Omaha, Neb., for defendants Jack Huffman, Russel Harris, and George E. Proudfit.

Joseph T. Votava, of Omaha, Neb., amicus curiae.

DONOHOE and DELEHANT, District Judges.

After due notice and hearing, the court has denied the prayer of the plaintiffs for the allowance of a preliminary injunction in this case. The implications of this action, beyond its significance to the parties litigant, prompt some reference to the incident that has evoked the litigation, and a summary statement of the reasons that have governed the instant decision.

The plaintiffs, father and son, operate, under the partnership style of A. B. Alpirn Company, in the city of Omaha, a scrap metal business, which has been in existence for fifty-one years. They buy, assemble and process for resale, chiefly to steel mills, scrap metal, iron and steel; and they also handle the sale of such commodities as brokers. In fact, the latter function seems, lately at least, to have produced much the greater part in tonnage of their business. In their local junk yard they employ two men for full time service, and one for part time duty and a lady for clerical work upon a basis regular, but limited in hours. A. B. Alpirn is seventy-two years of age and inactive in business. Morton Alpirn manages the concern but devotes a substantial amount of his time to the brokerage aspect of the firm's business.

Under date of March 1, 1943, in pursuance of the Act of October 16, 1941, 55 Stat. 742, as amended March 27, 1942, Title 50 U.S.C.A.Appendix §§ 721 to 724, and the regulations and executive orders issued thereunder, Metals Reserve Company, an agency clothed with adequate authority therefor, made two separate but concurrent requisitions of all scrap materials, about one hundred sixty tons in weight, located on the plaintiffs' premises and also all of the plaintiffs' machinery and equipment for the processing for market of scrap material, there, and in another storage space, located, including five or six metal shearing machines, a scale, a magnet and generator and a locomotive crane. These requisitions were directed to the United States Marshal (the defendant, Proudfit) who, on March 13, 1943, executed them by seizing and taking possession of the property which he placed forthwith in the possession of Aaron Ferrer and Sons Company as custodian for Metals Reserve Company and for the United States of America, by which custodian it was to be disposed of in connection with the production of materials needed in the war effort.

On March 19, 1943, the plaintiffs instituted this proceeding praying in the complaint and by motion, successively for a restraining order, a preliminary injunction, and upon final hearing a perpetual injunction against the removal of the seized property from the plaintiffs' premises, and against the interference by the defendants with the plaintiffs' alleged ownership or use thereof, and for general relief. Broadly, the claim is based at least in argument upon the asserted unconstitutionality of the seizure and certain irregularities in the procedure pursued in making it. No issue is made respecting the designation of Metals Reserve Company as an agency empowered by the President to exercise the statutory authority. Therefore, the steps conferring that power will not be discussed here, beyond the comment that their regularity is clearly shown from the records,

orders and regulations submitted by the defendants, who are before the court.

Only the appearing individual defendants had been served with process so far as the files disclosed at the time of the hearing. A restraining order was denied at the senior judge of the district who, however, set the case down for an early hearing upon the motion for preliminary injunction in which both judges participated. That hearing was had and this discussion arises from it and the pleadings.

The Act of October 16, 1941, in its present form, as amended by the Act of March 27, 1942, clothes the President, during the national emergency ·declared on May 27, 1941, but not later than June 30, 1943, with authority to requisition (inter alia) machinery, tools, or materials, "whenever the President * * * determines that (1) the use of any military or naval equipment, supplies, or munitions, or component parts thereof, or machinery, tools, or materials necessary for the manufacture, servicing, or operation of such equipment, supplies, or munitions is needed for the defense of the United States; (2) such need is immediate and impending and such as will not admit of delay or resort to any other source of supply; and (3) all other means of obtaining the use of such property for the defense of the United States upon fair and reasonable terms have been exhausted." That sentence prescribes the facts whose determination by the President shall sustain not only his requisition of the property but also its disposition by him "in such manner as he may determine is necessary for the defense of the United States".

Touching the important question of reimbursement of the owner for the taking; the act first conditions the requisition "upon the payment of fair and just compensation for such property to be determined as hereinafter provided"; and in greater detail requires that: "The President shall determine the amount of the fair and just compensation to be paid for any property requisitioned and taken over pursuant to this Act and the fair value of any property returned under section 2 of this Act but each such determination shall be made as of the time it is requisitioned or returned, as the case may be, in accordance with the provision for just compensation in the fifth amendment to the Constitution of the United States. If, upon any such requisition of property, the person entitled to receive the amount so determined by the President as the fair and just compensation for the property is unwilling to accept the same as full and complete compensation for such property he shall be paid 50 per centum of such amount and shall be entitled to sue the United States in the Court of Claims or in any district court of the United States * * * for an additional amount which, when added to the amount so paid to him, he considers to be fair and just compensation for such property." The second section of the Act allows the return to the original owner in certain circumstances of property no longer needed for defense; the third section requires regular and frequent reports to the Congress by the President of his exercise of the power of requisition; and the fourth section allows him to exercise the power through directed or appointed departments, agencies, boards or officers.

While the complaint does not expressly assail the constitutionality of the Act of October 16, 1941, as amended, or the general presidential power thereunder, the argument of counsel upon the hearing might be considered as tendering that issue. It is not well taken.

The court considers that the Act is supportable, first, as the exercise of a power expressly granted to the Congress by the constitution, and, secondly, as the use of a prerogative of government inevitable from the very nature of the function of government. By Article I, Section 8, of the Constitution it is provided that the Congress shall have, among others, the power "* * * To declare War, * * * To raise and support Armies, * * * To provide and maintain a Navy; * * * To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions; To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States * * *; *And To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."* (Emphasis added) Less directly, too, that section seems to place upon the Congress a substantial measure of authority in the making of provision for the common defense which, by the preamble, is a declared objective of the entire constitution. It would seem to be

manifest that the erection of a uniform and equitable system of requisitioning of needed materials, equipment and tools should be regarded as proper for carrying into execution the power of Congress for the raising and equipping of armies and the provision for and maintenance of navies, and even more obvious that the practical exercise of the power of requisition should be committed to the President as an incident to his office and prerogatives as Commander in Chief of the armed forces. Indeed, quite independently of any congressional grant of authority, the power of requisition in emergencies incident to war has been held to rest in the President as a function of his miliary office. And the Act itself may be regarded in part at least as a recognition of that necessary power and the provision of a uniform and consistent pattern for its orderly administration.

In our jurisprudence the power of requisition of private property in the face of urgent military necessity has consistently been recognized, and certain canons for its exercise have been declared. Nor have the possession and actual exercise of that power been reserved solely to the Commander in Chief of the armed forces. In immediate and critical emergencies it has been allowed to subordinate officers. Thus in Mitchell v. Harmony, 54 U.S. 115, 126, 134, 13 How. 115, 14 L.Ed. 75, which involved an officer's requisition of privately owned property during the Mexican War, Mr. Chief Justice Taney, while denying the existence of the emergency then claimed, stated: "There are, without doubt, occasions in which private property may lawfully be taken possession of or destroyed to prevent it from falling into the hands of the public enemy; and also where a military officer, charged with a particular duty, may impress private property into the public service or take it for public use. Unquestionably, in such cases, the government is bound to make full compensation to the owner; but the officer is not a trespasser. But we are clearly of opinion, that in all of these cases the danger must be immediate and impending; or the necessity urgent for the public service, such as will not admit of delay, and where the action of the civil authority would be too late in providing the means which the occasion calls for. It is impossible to define the particular circumstances of danger or necessity in which this power may be lawfully exercised. Every case must depend upon its own circumstances. It is the emergency that gives

the right, and the emergency must be shown to exist before the taking can be justified."

Again, in United States v. Russell, 80 U.S. 623, 13 Wall. 623, 629, 20 L.Ed. 474, where the seizure of privately owned cargo vessels during the civil war was examined, Mr. Justice Clifford said: "Such a taking of private property by the government, when the emergency of the public service in time of war or impending public danger is too urgent to admit of delay, is everywhere regarded as justified, if the necessity for the use of the property is imperative and immediate, and the danger, as heretofore described, is impending, and it is equally clear that the taking of such property under such circumstances creates an obligation on the part of the government to reimburse the owner to the full value of the service. Private rights, under such extreme and imperious circumstances, must give way for the time to the public good, but the government must make full restitution for the sacrifice."

Instructive upon the power of the parent government in seasons of war over the property of private citizens are Legal Tender Cases, 79 U.S. 457, 12 Wall. 457, 20 L.Ed. 287; Stewart v. Kahn, 78 U.S. 493, 11 Wall. 493, 20 L.Ed. 176; McKinley v. United States, 249 U.S. 397, 39 S.Ct. 324, 63 L.Ed. 668, and especially the discussion of Mr. Justice Sutherland in United States v. MacIntosh, 283 U.S. 605, 622, 623, 51 S.Ct. 570, 75 L.Ed. 1302 and the historical analysis by Mr. Chief Justice White in Selective Draft Law Cases, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349, L.R.A.1918C, 361, Ann. Cas.1918B, 856. See also United States v. Wright, D.C.Del., 48 F.Supp. 687; Brady v. Atlantic Works, 3 Fed.Cas. 1190, No. 1,794; and Holmes v. Sheridan, 12 Fed. Cas. 422, No.6,644.

The suggestion has been made (supra) that the government's power to requisition private property for public use in an emergency needs no express constitutional grant for its foundation, but springs from the very nature of government. That thought is expressed, in reference to the exercise of the normally less urgent power of Eminent Domain in United States v. City of Tiffin, C.C., 190 F. 279, 280, in which it is asserted that: "The Constitution does not operate to create this right, but only to limit its exercise to certain objects. The several states for their own administrative purposes within their own borders hold authority of the same generally broad and

extraconstitutional nature. The principle of strict construction of either the nature or extent of this right applies to neither sovereignty for the reason that such right is a very part of the sovereignty itself, existing from the beginning." See also United States v. .8677 Acre of Land in Richland County and City of Columbia, D. C.E.D.S.C., 42 F.Supp. 91, United States v. McFarland, 4 Cir., 15 F.2d 823.

■ The foregoing reasoning finds support rather than opposition in the Fifth Amendment to the Constitution of the United States. What is there forbidden is not the taking of private property for public use. Inferentially, such taking is there sanctioned as a presumed prerogative of government. And the amendment forbids such taking only when it is sought to be accomplished *without just compensation.*

A power of appropriation, essentially indistinguishable from that now being exercised, was asserted in sundry acts and employed by the government of the United States during the World War of 1917–1918. Act of June 15, 1917, 40 St. at L. 182 relating to appropriation of shipping and shipbuilding facilities; Act of March 1, 1918, 40 St. at L. 438, granting Emergency Fleet Corporation certain powers of requisition respecting housing and transportation facilities; Act of June 3, 1916, 39 St. at L. 166, National Defense Act, which incidentally, like the Act here examined, was adopted in time of international peace but in reasonable apprehension of war which came ten months after its passage. They were consistently sustained as valid by the courts, even to the extent of intercepting the obligations of persons whose property or facilities were taken, to fulfill private contracts whose performance presumed their continued possession and employment of such property and facilities. United States v. McFarland, 4 Cir., 15 F.2d 823, 826, which declares the general rule that: "The President, as Commander-in-Chief of the Army and Navy, doubtless had the constitutional power in war time, in cases of immediate and pressing exigency, to appropriate private property to public uses; the government being bound to make just compensation therefor." See also Manufacturers' Land & Improvement Co. v. U. S. Shipping Board Emergency Fleet Corporation, 264 U.S. 250, 44 S.Ct. 314, 68 L.Ed. 664; Roxford Knitting Co. v. Moore & Tierney, 2 Cir., 265 F. 177, 11 A.L.R. 1415; United States v. Gordin, D.C., 287 F. 565; United States v. Stein, D.C., 48 F.2d 626; Mawhinney v. Millbrook Woolen Mills, 105 Misc. 99, 172 N.Y.S. 461; Id., 231 N.Y. 290, 132 N.E. 93, 15 A.L.R. 1506; Richmond Fairfield Ry. Co. v. Llewellyn, 156 Va. 258, 157 S.E. 809, 162 S.E. 601; Northern Pac. Ry. Co. v. State of North Dakota, ex rel. Langer, 250 U.S. 135, 39 S.Ct. 502, 63 L.Ed. 897; Dakota Central Tel. Co. v. State of South Dakota ex rel. Payne, 250 U.S. 163, 39 S.Ct. 507, 63 L.Ed. 910, 4 A.L.R. 1623; Hamilton v. Kentucky Distilleries & Warehouse Co., 251 U.S. 146, 40 S.Ct. 106, 64 L.Ed. 194.

The existence of an emergency warranting the legislation presently involved can not be denied. It has already been pointed out that the comprehensive National Defense Act in force during the last previous World War was enacted more than ten months prior to the actual onset of formal warfare. In that respect there is a similarity between the two measures. They were deliberately and prudently anticipatory of probably impending hostilities which actually eventuated. Confirmatory reenacting amendment of the present act has occurred since the declaration of the presently persisting state of war.

At this point, for it touches upon the factor of military emergency, mention may be made, without amplification, of the impact upon this issue, of the modern technological revolution in warfare and communication. Defensive measures which, a century ago, might have awaited deliberation and the orderly course of judicial process, must now be taken resolutely and immediately. Science has changed not alone the methods of formal warfare, but also and especially the relationship to it of the civilian population.

■ The right of government to exercise the power which the plaintiffs assail being allowed, it follows that, if the discretion preliminary to its exercise is reposed in the executive, that discretion is not a proper subject for judicial review. And this is particularly true when the relief sought is through the extraordinary and thwarting remedy of injunction.

This thought was expressed very early in our history. In 1827, in Martin v. Mott, 25 U.S. 19, 29, 12 Wheat. 19, 6 L.Ed. 537, a question arose which rested upon the power of the President to call out the militia, in the decision of which Mr. Justice Story said: "The power thus confided by congress to the president, is, doubtless, of a

very high and delicate nature. A free people are naturally jealous of the exercise of military power; and the power to call the militia into actual service, is certainly felt to be one of no ordinary magnitude. But it is not a power whch can be executed without a correspondent responsibility. It is, in its terms, a limited power, confined to cases of actual invasion, or of imminent danger of invasion. If it be a limited power, the question arises, by whom is the exigency to be judged of and decided? Is the president the sole and exclusive judge whether the exigency has arisen, or is it to be considered as an open question, upon which every officer to whom the orders of the president are addressed, may decide for himself, and equally open to be contested by every militiaman who shall refuse to obey the orders of the president? We are all of the opinion that the authority to decide whether the exigency has arisen, belongs exclusively to the president, and that his decision is conclusive upon all other persons. We think that this construction necessarily results from the nature of the power itself, and from the manifest object contemplated by the act of congress." That doctrine was again examined and affirmed in Luther v. Borden, 48 U.S. 1, 7 How. 1, 12 L.Ed. 581.

Antedating Martin v. Mott (supra), the Supreme Court in Marbury v. Madison, 5 U.S. 137, 166, 1 Cranch 137, 2 L.Ed. 60, where a power purely political, and in no wise military, was involved, said in 1803, respecting executive action involving the exercise of discretion: "Whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion. The subjects are political. They respect the nation, not individual rights, and being entrusted to the executive, the decision of the executive is conclusive." In 1866, in the celebrated case of State of Mississippi v. Johnson, 71 U.S. 475, 4 Wall. 475, 18 L.Ed. 437, it was determined that the President of the United States can not be restrained by injunction from carrying into effect an act of Congress alleged to be unconstitutional; and the court refused to allow the filing of a bill designed to intercept the enforcement of the Reconstruction Acts.

To the same—or similar—effect are many cases recognizing the separation and mutual independence of the judicial and executive offices and their functions. They will not be assembled in any appreciable number but citation may be made of State of Louisiana v. McAdoo, 234 U.S. 627, 34 S.Ct. 938, 58 L.Ed. 1506; Southwestern Tel. & Tel. Co. v. City of Houston, D.C., 256 F. 690; Weeks v. United States ex rel. Creary, 51 App.D.C. 195, 277 F. 594; Adams v. Nagle, 303 U.S. 532, 58 S.Ct. 687, 82 L.Ed. 999; City of Oakland v. United States, 9 Cir., 124 F.2d 959; United States v. 243.22 Acres of Land in Village of Farmingdale, Town of Babylon, Suffolk County, N. Y., D.C., 43 F.Supp. 561; Mississippi & Rum River Boom Co. v. Patterson, 98 U.S. 403, 25 L.Ed. 206; Atlantic Coast Line R. Co. v. Town of Sebring, 5 Cir., 12 F.2d 679; Barnidge v. United States, 8 Cir., 101 F.2d 295; Coggeshall v. United States, 4 Cir., 95 F.2d 986; United States v. Gideion-Anderson Co., D.C., 16 F.Supp. 627; United States v. 72 Acres of Land, More or Less, Situate in City of Oakland, Alameda County, D.C., 37 F.Supp. 297; United States v. 243.22 Acres of Land in Town of Babylon, Suffolk County, N. Y., 2 Cir., 129 F.2d 678.

■ Upon the authorities suggested and the general principle of the immunity of the executive function from frustration by the judiciary through the process of injunction, the court will not interfere with the defendants in their performance in this emergency of an executive task duly and expressly committed to the President.

■ In their complaint and motion for preliminary injunction the plaintiffs rely upon the claim that the formal determination of the President preliminary to this requisition is false in fact in its assertion that all other means of obtaining the use of such property for the defense of the United States upon fair and reasonable terms have been exhausted. To that contention two answers are available: First, if it were true it could not avail the plaintiffs in this proceeding; and secondly, it is utterly unsupported.

■ The language of the first section of the Act of October 16, 1941, as amended will not be repeated but it may be recalled that it makes the right to requisition dependent not upon *the existence* as an objective and judicially ascertainable reality of the three facts that are set apart and specifically numbered, but rather upon *the President's determination that they exist.* When he, through appropriate channels, so determines and declares, the foundation for requisition is laid. He may be mis-

taken in his conclusion but once made it is final, and beyond both the power and the inclination of this court to review or overturn. And the court places its conclusion in this particular upon that broad ground rather than on the factual inadequacy next intimated.

It ought, however, to be added that the evidence wholly fails to sustain those allegations of the plaintiffs. They show that there are relatively large quantities of available scrap metal, several thousands of tons, in the Omaha region, of which the plaintiffs' supply is a small portion, and that the nation's steel mills now have in their yards a substantial backlog of such material. And with respect to the machinery items requisitioned they show that no negotiations were initiated with the plaintiffs by any governmental agency for their purchase and also that trade journals bear advertisements for sale of such appliances. But in a variety of respects that evidence is wholly inadequate to sustain the allegations of the plaintiffs here noted. The proof neglects altogether, among other factors, the volume in which the government has need both of scrap metal and of instruments and tools; the places in the country where such items may be of immediately urgent necessity; the period of time required to exhaust the stock presently in possession of the mills; and the fact that the advertised appliances are in the main located in remote places in the nation. So, even if the court were authorized to examine into the accuracy of the declaration preliminary to requisition, it would not hesitate to find that the plaintiffs have failed to sustain the burden of proof in respect of its falsity.

■ A second consideration equally fatal to the plaintiffs' demand for injunctive relief is the immediate availability to them of a plain and adequate remedy at law. No exhaustive discussion is required to establish the existence of that remedy. It lies in their right to receive at the hands of the government fair and just compensation for the property taken and ultimately to the judicial determination of its valuation. Such a right is declared in Mitchell v. Harmony (supra) and United States v. Russell (supra), to arise in the instant, and from the very fact, of taking even though the taking be not in furtherance of a congressional act of general application. And numerous other decided cases reach a like conclusion. But in this instance the Act of October 16, 1941, provides expressly for

such compensation and preserves the constitutional right of the former owner to just compensation for his property taken for the public use. It has been implemented by the erection of a comprehensive method of valuation to be employed in such cases, which again reserves the right to judicial determination of the actual fair and just compensation.

The court notes the contention of the plaintiffs that the taking of the machinery involved will despoil them of their business, in that it will deprive them of the tools wherewith they are accustomed to process for resale junk which they purchase from others. While they magnify that aspect of their damage by neglecting the inutility of the machinery in their brokerage business and the circumstance that many smaller junk yards operate without such machinery, it does seem probable that their local junk operations will be measurably curtailed, even rendered so unprofitable that they may be abandoned.

But even that unsought consequence, however regrettable, can not be allowed to thwart the effort of the United States government for its, and the plaintiffs', defense. And such results are not infrequently the effect of requisitions and even of the less imperative process of Eminent Domain.

■ Nor is the allegation pertinent that a chattel mortgage in substantial amount to a third party is outstanding upon all— or the greater part—of the property. The process of requisition is not immediately concerned with the existing title to, or encumbrance upon, the requisitioned property. Those factors become material when determination is made as to who are entitled to receive the agreed or established just compensation, and in what amounts and order of priority. Encumbrances, in whatever form or amount, can not operate to defeat the sovereign right to the capture of the property for the national defense.

■ Thirdly, the plaintiffs ask for an injunctive writ because the taking agency did not pay, tender or deposit the amount of the compensation for the property taken, at or prior to the time of service of the requisition. A sufficient and necessary answer to that position is that the law is settled beyond argument that such payment, tender or deposit is not necessary.

Thus in George Moore Ice Cream Co. v. Rose, 289 U.S. 373, 53 S.Ct. 620, 623, 77 L.Ed. 1265, it was said: "This court has

often held that a pledge of the public faith and credit will permit the seizure of property by right of eminent domain, though what is due for compensation must be ascertained thereafter", in support of which are cited Sweet v. Rechel, 159 U.S. 380, 16 S.Ct. 43, 40 L.Ed. 188; Crozier v. Fried Krupp Aktiengesellschaft, 224 U.S. 290, 32 S.Ct. 488, 56 L.Ed. 771; Joslin Mfg. Co. v. City of Providence, 262 U.S. 668, 677, 43 S.Ct. 684, 67 L.Ed. 1167; Dohany v. Rogers, 281 U.S. 362, 366, 50 S.Ct. 299, 74 L.Ed. 904, 68 A.L.R. 434; and Hurley v. Kincaid, 285 U.S. 95, 104, 105, 52 S.Ct. 267, 269, 76 L.Ed. 637. In Hurley v. Kincaid (cited) Mr. Justice Brandeis declared explicitly, in respect of one whose property was taken for a public use, that: "The Fifth Amendment does not entitle him to be paid in advance of the taking." To exactly the same effect is Yearsley v. W. A. Ross Construction Co., 309 U.S. 18, 60 S.Ct. 413, 415, 84 L.Ed. 554, which arose in this district. There Mr. Chief Justice Hughes, citing many supporting authorities, said: "Petitioners present the question whether the building of the dikes and the erosion of their land, because of the consequent diversion of the current of the river, constituted a taking of their property for which compensation must be made. We do not find it necessary to pass upon that question, for if the authorized action in this instance does constitute a taking of property for which there must be just compensation under the Fifth Amendment, the Government has impliedly promised to pay that compensation and has afforded a remedy for its recovery by a suit in the Court of Claims. * * * 'The Fifth Amendment does not entitle him (the owner) to be paid in advance of the taking' and the statute affords a plain and adequate remedy." In passing it may be emphasized that in addition to the usually available forum of the Court of Claims the present requisition act has allowed suit in the District Courts of the United States. See also United States v. McIntosh, D.C., 2 F.Supp. 244, 3 F.Supp. 715; on appeal McIntosh v. United States, 4 Cir., 70 F.2d 507; United States v. Stein, D.C., 48 F.2d 626.

█ The court does not overlook the expression in the Congressional Act to the effect that the President may requisition "*upon* the payment of compensation" etc. But the term "upon" in that context seems not to mean, "at or after", but rather to propose the terms or consideration which shall support the taking. That interpretation preserves the pattern of the law upon the subject. And it is peculiarly appropriate where the property taken is personalty whose identification, enumeration and evaluation must frequently abide its actual reduction to possession by the condemning authority. The case is generally, though not always, quite different with real estate whose condition and value are notorious. Chattel property requisitioned may not be observable, much less subject to appraisal, until it is actually taken and examined. And that reflection is peculiarly appropriate in the present circumstances.

█ Finally, the appearing defendants contend that, the requisitions having been duly served, the title to the property designated therein has passed to an agency of the United States and the former title of the plaintiffs in it has been divested, and can not now support this action. The court considers that position to be well taken and to be a ground sufficient in itself to necessitate the ruling now announced.

The language of the requisition act supports that view. The provision for the determination of value is in respect of "*any property requisitioned and taken*", as of something accomplished and completed. Then it is clearly contemplated that some appreciable period of time must elapse between the service of the requisition and the final determination of the fair value of the property taken. Surely, it will not be contended that, pending that determination, the title shall either remain in the former owner or be in some dubious suspended status. And if not, then the instant of its passing should logically be when the requisition is served. But an even more persuasive intimation of the immediate transfer of title is gathered from the fact that in the same sentence of the Act and in the conjunctive, the President is empowered "to requisition such property * * * and to dispose of such property in such manner as he may determine is necessary for the defense of the United States." Now the absolute power of disposal, thus granted, may include, destruction, sale, exchange and simple use, along, perhaps, with other possible employments. And all of them are consistent—and consistent only—with the enjoyment of full title by the disposing authority.

And the theory of the immediate passage of title is supported by authority. United

States v. Stein, D.C., 48 F.2d 626; Brooks-Scanlon Corp. v. United States, 265 U.S. 106, 44 S.Ct. 471, 68 L.Ed. 934. In the related field of Eminent Domain the issue has clearly been decided and it is there held that upon the filing by the United States under Title 40 U.S.C.A. § 258a of the Declaration of Taking and the deposit of the estimated fair compensation, (which, let it be noted, may be far less than the actual value of the property taken and the just compensation ultimately determined) the title to the property taken vests eo instanti in the United States, and in its stead, the former owner has the right to just compensation for it; the extent and amount of which are determinable in the ensuing action. United States v. Certain Parcels of Land in Prince George's County, Md., D.C.Md., 40 F.Supp. 436.

The court has thus given full consideration to the several contentions of the plaintiffs. It finds none of them sufficient to support their claim to preliminary injunctive relief.