## KEN-RAD TUBE & LAMP CORPORATION, OWENSBORO, KY., v. BADEAU.

### No. 132.

District Court, W. D. Kentucky, Owensboro Division.

May 9, 1944.

Thomas E. Sandidge and Wilbur K. Miller, both of Owensboro, Ky., and Max O'Rell Truitt and Carl McFarland, both of Washington, D. C., for plaintiff.

Francis M. Shea, Asst. Atty. Gen., Eli H. Brown, III, U. S. Atty., of Louisville, Ky., and Joseph A. Fanelli, Sp. Asst. to Atty. Gen., for defendant.

**SWINFORD, District Judge.**

This case is before me on the plaintiff's motion for a permanent injunction and on the defendant's motion to dismiss the complaint. The record is complete and it is finally submitted for determination on its merits.

The plaintiff, the Ken-Rad Tube and Lamp Corporation, of Owensboro, Kentucky, seeks to permanently enjoin the defendant, Carroll Badeau, from placing in effect, in any of its plants, an order of the National War Labor Board pertaining to certain wage readjustments in the plaintiff's plants and to permanently enjoin the defendant from seizing, holding possession of or operating any properties of the plaintiff.

The plaintiff is, and has been for many years, successfully engaged in the manufacture of radio tubes and incandescent lamps, with plants located at Owensboro and Bowling Green, Kentucky, and Tell City, Huntingburg and Rockport, Indiana. It employs approximately five thousand people.

The defendant, Carroll Badeau, who is a Colonel in the United States Army and acting under orders from his superiors, has seized possession of the plaintiff's properties.

The entire plant and properties of the plaintiff, in so far as this lawsuit is concerned, have been, were at the time of the seizure, and are now and will continue to be admittedly devoted exclusively to the manufacture of essential war materials.

The source of the authority claimed by the defendant for his action in seizing the property is an order of the President of the United States, dated April 13, 1944 and addressed to the Secretary of War. The order is preceded by the following recital:

"Whereas after investigation I find and proclaim that there is a threatened interruption of the operation of the plants and facilities of Ken-Rad Tube and Lamp Corporation and Ken-Rad Transmitting Tube Corporation, located at Owensboro, Kentucky, as a result of a labor disturbance, and that the war effort would be unduly impeded or delayed by such interruption:

"Now, therefore, by virtue of the power and authority vested in me by the Constitution and laws of the United States, including section 9 of the Selective Training and Service Act of 1940, as amended, as President of the United States and Commander in Chief of the Army and Navy of the United States, it is hereby directed as follows:"

It is contended by the plaintiff that the seizure is without authority of law; that the order of the President was based primarily upon a report to him of the War Labor Board that the labor conditions in the plaintiff's plants were in an unsettled state and that production would be hampered, retarded or stopped by labor disputes and threatened strikes; that all of this was caused by the fact that the plaintiff had refused to put into effect an order of the War Labor Board.

The plaintiff admits that it declined to abide by the order of the War Labor Board but states that the order was void and of no effect, because of the failure of the Board to accord the plaintiff a hearing, the unlawful assumption of the rule-making power by the Board, the unlawful reduction of the beginner's training period, the unlawful retroactive effect of the order, the unlawful participation of employee representatives in the Board's order, and the imposition of confiscatory wage rates, which did not comply with the provisions of the Act that any order of the Board shall be fair and equitable.

To summarize the plaintiff's position in this respect, it reasons that since the order of the President, directing the seizure of the plants, was based upon a fear of threatened strikes and the threatened strikes were the result of the failure of the plaintiff to abide by an order of the War Labor Board and the order of the War Labor Board was invalid because of the above enumerated reasons, then the order of the President was invalid and there could, therefore, be no seizure.

I do not think that the determination of this case depends upon whether or not the order of the War Labor Board was valid or invalid.

The decision must be based upon either constitutional or statutory authority vesting in the President a legal right to issue such an order. If he had that right, by statute, or in the absence of adequate statute, the right under the Constitution, the plaintiff has failed in the case and its complaint should be dismissed. Or if it be determined from the record that, even though he might have had the right, he acted arbitrarily and without cause in issuing such an order, then the prayer of the plaintiff's complaint should be sustained and an equitable order entered.

■ It is my judgment that this case, and all others like it, may be reduced to a simple formula: Did the President act arbitrarily in ordering the facilities to be taken over by the Army? Proof that he did so act shall be upon him who asserts it.

If this seems to be an extreme view it should be called to the attention of those who so claim that, with the country at war, fighting for its very existence, extremities are commonplace. No war hysteria should prompt the adoption of basically unsound legal reasoning; neither should blind complacency or a false sense of the country's security cause the courts of the land to grant to those charged with preserving the nation less than the full measure of constitutional and legislative authority.

■ Before going into the determination of this case on its merits it is necessary to consider and pass upon certain defenses. It is first contended that the suit here is one against the United States, to which the United States has not consented. In support of this position the defendant cites: State of New Mexico v. Lane, 243 U.S. 52, 37 S.Ct. 348, 61 L.Ed. 588; State of Louisiana v. Garfield, 211 U.S. 70, 29 S.Ct. 31, 53 L.Ed. 92; State of Minnesota v. Hitchcock, 185 U.S. 373, 22 S.Ct. 650, 46 L.Ed. 954; Naganab v. Hitchcock, 202 U.S. 473, 26 S.Ct. 667, 50 L.Ed. 1113. I do not believe any of these cases warrant the court in dismissing this proceeding. While I, of course, acknowledge the general rule as laid down in each of these cases, it is a well-recognized exception that where the government acquires property from a party to a pending suit, its rights in such property are subject to the results of the litigation the same as would be those of an individual. See Ward et al. v. Congress Const. Co., 7 Cir., 99 F. 598; Philadelphia Co. v. Stimson, 223 U.S. 605, 32 S.Ct. 340, 56 L.Ed. 570; Miguel v. McCarl, 291 U.S. 442, 54 S.Ct. 465, 78 L.Ed. 901; Payne v. Central Pacific R. Co., 255 U.S. 228, 41 S.Ct. 314, 65 L.Ed. 598.

In the case of Work v. Louisiana, 269 U.S. 250, 46 S.Ct. 92, 94, 70 L.Ed. 259, the Secretary of the Interior was proceeded

against for injunctive relief by the State of Louisiana to prevent the rejection of a claim to lands upon what was alleged to be an erroneous interpretation of the law. The opinion stated: "It is clear that if this order exceeds the authority conferred upon the Secretary by law} and is an illegal act done under color of his office, he may be enjoined from carrying it into effect. Noble v. Union River [Logging] R. Co., 147 U.S. 165, 171, 172, 13 S.Ct. 271, 37 L.Ed. 123; Garfield v. Goldsby, 211 U.S. 249, 261, 262, 29 S.Ct. 62, 53 L.Ed. 168; Lane v. Watts, 234 U.S. 525, 540, 34 S.Ct. 965, 58 L. Ed. 1440; Payne v. Central Ry. Co., 255 U.S. 228, 238, 41 S.Ct. 314, 65 L.Ed. 598; Santa Fé Pacific Railroad Co. v. Fall, 259 U.S. 197, 199, 42 S.Ct. 466, 66 L.Ed. 896; [State of] Colorado v. Toll, 268 U.S. 228, 230, 45 S.Ct. 505, 69 L.Ed. 927. A suit for such purposes is not one against the United States, even though it still retains the legal title to the lands, and it is not an indispensable party. Garfield v. Goldsby, supra, [211 U.S. at] pages 260, 262, (29 S.Ct. 62), [53 L.Ed. 168]; Lane v. Watts, supra, [234 U. S. at] page 540 (34 S.Ct. 965), [58 L.Ed. 1440]."

In the recent case of Ickes v. Fox, 300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525, it was sought to enjoin the Secretary of the Interior from enforcing an order, the wrongful effect of which was to deprive respondents of vested property. The question was made that the United States was an indispensable party but the Supreme Court held that such a suit could be maintained without the presence of the United States and that its decision rested upon the authority of many cases from that Court. Certain cases were cited among which were some of those to which I have referred.

 It is further contended that the suit should be dismissed for lack of indispensable parties. It is urged that Carroll Badeau, the defendant, had no choice other than to comply with the order of the President and that he was acting purely in a ministerial capacity and that if the injunction would lie, it should have been brought against his superiors, even to the extent of making the President a party.

I think the action here is one in which the rights of the parties may be determined, where the injunction is sought against the agent with as much propriety as if it were sought to restrain the principal, had he been within the jurisdiction of the court. Os-

born v. President, etc., of Bank, 9 Wheat. 738, 22 U.S. 738, 6 L.Ed. 204.

In the case of Ryan v. Amazon Petroleum Corp., 5 Cir., 71 F.2d 1, 4, and more particularly identified as the now historic "Hot Oil" case, the Circuit Court of Appeals said: "1. The Secretary of the Interior is not personally doing or threatening the acts of trespass and of prosecution which are sought to be enjoined. Although the actors may be authorized and incited by him so that he would be a proper codefendant if he were within the court's reach, the court has power to stop the trespassing by those within its jurisdiction irrespective of their claim that they are acting for others. Osborn v. [President, etc., of] Bank of United States, 9 Wheat. 738, 6 L.Ed. 204; State of Colorado v. Toll, Supt., 268 U.S. 228, 45 S.Ct. 505, 69 L.Ed. 927. This is not a bill to cancel the Secretary's Regulations, but only to test their efficacy to protect defendants in their alleged trespasses against complainants' rights. There is no more need to make the Secretary a party for this purpose than to make the President a party because he promulgated the Code or the Congress because it enacted the statute."

It should be pointed out that in this case, or cases, since it embraced also the Panama Refining Company case, the Supreme Court reversed the Circuit Court of Appeals in its decision, but not on the jurisdictional grounds to which the language above quoted is addressed. 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446.

I conclude that the jurisdiction of the court must be sustained.

We now come to the determination of the case on its merits. I must confess that the position of the plaintiff is somewhat obscure and it is not entirely clear to me just what it is seeking to have done. The original complaint asks, among other things, that the defendant be permanently enjoined from "holding possession of or operating any properties of the plaintiff". In the brief which was filed after the oral arguments, the plaintiff seems to undertake to convey to the court the idea that it has no serious objection to the using of the property so long as the present occupant does not put into effect and force the order of the President as it directs a compliance with the wage increase and back-pay provisions of the order of the War Labor Board.

It must be obvious to the plaintiff that these two things cannot be separated in a proceeding of this kind, and it cannot ex-

pect to resort to the general equity powers of the court on its prayer for general equitable relief. If the President, by reason of the statutes or by his constitutional powers, has authority, and is justified in the exercise of that authority, to take over the plants, he would certainly have authority to determine and designate the basis on which it was to be operated.

■ This plant is at present being operated by the Government with Government funds The method of the Government in operating any business which it has the right to operate cannot be questioned on the basis of a complaint which attacks its right to operate the business at all.

The War Labor Disputes Act by section 3, 50 U.S.C.A.Appendix, § 1503, amends section 9 of the Selective Training and Service Act of 1940. For the purpose of clarity I think it is best to quote this section in full:

"Sec. 3. Section 9 of the Selective Training and Service Act of 1940 is hereby amended by adding at the end thereof the following new paragraph:

" 'The power of the President under the foregoing provisions of this section to take immediate possession of any plant upon a failure to comply with any such provisions, and the authority granted by this section for the use and operation by the United States or in its interests of any plant of which possession is so taken, shall also apply as hereinafter provided to any plant, mine, or facility equipped for the manufacture, production, or mining of any articles or materials which may be required for the war effort or which may be useful in connection therewith. Such power and authority may be exercised by the President through such department or agency of the Government as he may designate, and may be exercised with respect to any such plant, mine, or facility whenever the President finds, after investigation, and proclaims that there is an interruption of the operation of such plant, mine, or facility as a result of a strike or other labor disturbance, that the war effort will be unduly impeded or delayed by such interruption, and that the exercise of such power and authority is necessary to insure the operation of such plant, mine, or facility in the interest of the war effort: Provided, That whenever any such plant, mine, or facility has been or is hereafter so taken by reason of a strike, lock-out, threatened strike, threatened lock-out, work stoppage, or other cause, such plant,

mine, or facility shall be returned to the owners thereof as soon as practicable, but in no event more than sixty days after the restoration of the productive efficiency thereof prevailing prior to the taking of possession thereof: Provided further, That possession of any plant, mine, or facility shall not be taken under authority of this section after the termination of hostilities in the present war, as proclaimed by the President, or after the termination of the War Labor Disputes Act; and the authority to operate any such plant, mine, or facility under the provisions of this section shall terminate at the end of six months after the termination of such hostilities as so proclaimed."

If this is a constitutional enactment and there is no showing that the President acted arbitrarily, coupled with the acknowledged fact that the plants in question were engaged exclusively in the manufacture of essential war materials, the defendant's position must be sustained.

■ It is not claimed that this act is unconstitutional. The record fails to disclose any grounds upon which the court could find that the President, in issuing the order, acted arbitrarily or without cause. He was not bound by the findings of the War Labor Board. Even though they might have been based upon erroneous procedure or wrongful construction of facts, the President may have had other facts on which he determined his course. It is certain that there is ample evidence in the record that there was a threatened strike and a serious threat to production by reason of that fact, but even had the record not contained this, it is my judgment that section 9 does not confine the President to any one field of information but that he may make his own independent investigation and, subject to the determination by the courts that his action was not arbitrary, may act to prevent a cessation of operations of any plant or business or other agency which might be utilized to contribute to the war effort.

■ I further conclude that without an act of the Congress there was sufficient authority by the terms of the Constitution itself to justify the action of the President in this case. The President has no power to declare war, that belongs exclusively to Congress. But when war has been declared and is actually existing, his functions as Commander in Chief become of the highest importance and his operations

in that connection are entirely beyond the control of the legislature. There devolves upon him, by virtue of his office, a solemn responsibility to preserve the nation and it is my judgment that there is specifically granted to him authority to utilize all resources of the country to that end.

■ The Constitution is nothing more than a charter of rights and authority from the people to their Government. That Government consists of the individuals who, as officials, are in charge of its affairs at a given time. In order to determine what the people had in mind when they made this specific grant of power we must necessarily consider it in the light of circumstances as they existed at the time of the grant. We must recall that at that time the nation was very weak. Its preservation from invasion or occupation by a foreign power was uppermost in the minds of the people. Although the government was weak it ruled a vast and rich country, which attracted the dictators and excited the avarice of war lords of that day as it does now. It should be borne in mind that while modern instruments of warfare make America more vulnerable than in times past, then what is now the territorial United States was actually occupied by armies of foreign powers. I mention these things merely to emphasize that it must surely have been uppermost and foremost in the minds of the writers of the Constitution, of those whom they represented and those who later adopted it, that the President, as Commander in Chief of the Army and Navy of the United States, was not to have to resort to a lengthy procedure in order to defend, at a moment's notice, the very agencies which he might be seeking to use.

■ Charged with the grave responsibility of preserving a government which guarantees the property rights of individuals, the Chief Executive, as Commander in Chief, must not be hampered in the prosecution of the war effort. His exercise of authority to this end is subject only to the review by the courts that his actions are not arbitrary or without reasonable justification. With this limitation there need be no fear that constitutional government, as we know it in these United States, will be abolished, destroyed or impaired.

The prosecution of the war is the business of the executive branch of the government. What is necessary to that end must rest in the authority of the officials of that branch of the government. Their decisions must, in many instances, be based upon facts which they cannot make public or submit to debate. There has never been a time in the history of the world when such a policy was more properly applied than in this present emergency, with the United States engaged in prosecuting a defensive war on many fronts scattered over all parts of the world and with implements of modern warfare subjecting her territories and mainland to imminent danger of actual invasion in the course of a few hours, and with a part of her possessions occupied by enemy forces. It is sheer folly to say or pretend that the Government should admit of the slightest delay, for any cause, of the production of the war materials made by the plants involved in this lawsuit.

This position is not only substantiated by reason and principle but is merely a restatement of what has always been accepted as the correct judicial interpretation of the functions of the President in times of war or emergency.

It is well said in a recent case, Alpirn v. Huffman, D.C., 49 F.Supp. 337, 341: "Defensive measures which, a century ago, might have awaited deliberation and the orderly course of judicial process, must now be taken resolutely and immediately. Science has changed not alone the methods of formal warfare, but also and especially the relationship to it of the civilian population."

In the old case of United States v. Russell, 80 U.S. 623, 627, 13 Wall. 623, 20 L.Ed. 474, the court said: "Private property, the Constitution provides, shall not be taken for public use without just compensation, and it is clear that there are few safeguards ordained in the fundamental law against oppression and the exercise of arbitrary power of more ancient origin or of greater value to the citizen, as the provision for compensation, except in certain extreme cases, is a condition precedent annexed to the right of the government to deprive the owner of his property without his consent. Extraordinary and unforeseen occasions arise, however, beyond all doubt, in cases of extreme necessity in time of war or of immediate and impending public danger, in which private property may be impressed into the public service, or may be seized and appropriated to the public use, or may even be destroyed without the consent of the owner. Unquestionably such extreme cases may arise, as where the property taken is imperatively necessary in time of war to construct defences for the preservation of

a military post at the moment of an impending attack by the enemy, or for food or medicine for a sick and famishing army utterly destitute and without other means of such supplies, or to transport troops, munitions of war, or clothing to reinforce or supply an army in a distant field, where the necessity for such reinforcement or supplies is extreme and imperative, to enable those in command of the post to maintain their position or to repel an impending attack, provided it appears that other means of transportation could not be obtained, and that the transports impressed for the purpose were imperatively required for such immediate use."

Who can say that at this time such an emergency, as contemplated by the language of this opinion, does not now exist? See also, Mitchell v. Harmony, 54 U.S. 115, 13 How. 115, 14 L.Ed. 75; Marbury v. Madison, 5 U.S. 137, 1 Cranch 137, 2 L. Ed. 60; State of Mississippi v. Johnson, 71 U.S. 475, 4 Wall. 475, 18 L.Ed. 437. The case of Alpirn v. Huffman, supra, is an excellent opinion and has an accumulation of authorities on this and related points of law.

The Attorney General of the United States has recently made the following pertinent statement in an opinion on a similar situation. I quote: "The fact that the initial impact of these disturbances is on the production or distribution of essential civilian goods is not a reason for denying the Chief Executive and the Commander in Chief of the Army and Navy the power to take steps to protect the Nation's war effort. In modern war the maintenance of a healthy, orderly and stable civilian economy is essential to successful military effort. The Congress has recognized this fact by enacting such statutes as the Emergency Price Control Act of 1942 [50 U.S.C.A. Appendix, § 901 et seq.]; the Act of Oct. 2, 1942, entitled 'An Act to Amend the Emergency Price Control Act of 1942 and to aid in preventing inflation, and for other purposes, [50 U.S.C.A.Appendix, § 961 et seq.];' the Small Business Mobilization Law of June 11, 1942 [50 U.S.C.A.Appendix, § 1101 et seq.]; and the War Labor Disputes Act [50 U.S.C.A.Appendix, § 1501 et seq.]."

In addition to the long and unbroken chain of authorities for what I believe to be a most rational view of the situation presented by the record in this case, the Supreme Court in the now famous case, (decided June 21, 1943) of Kiyoshi Hirabayashi v. United States, 320 U.S. 81, on page 93, 63 S.Ct. 1375, on page 1382, 87 L.Ed. 1774, of the opinion said: "The war power of the national government is 'the power to wage war successfully.' See Charles Evans Hughes War Powers Under the Constitution, 42 A.B.A. Rep. 232, 238. It extends to every matter and activity so related to war as substantially to affect its conduct and progress. The power is not restricted to the winning of victories in the field and the repulse of enemy forces. It embraces every phase of the national defense, including the protection of war materials and the members of the armed forces from injury and from the dangers which attend the rise, prosecution and progress of war. Prize Cases, [(The Amy Warwick), 2 Black 635, 17 L.Ed. 459], supra; Miller v. United States, 11 Wall. 268, 303-314, 20 L.Ed. 135; Stewart v. Kahn, 11 Wall. 493, 506, 507, 20 L.Ed. 176; Selective Draft Law Cases, (Arver v. United States), 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349, L.R.A. 1918C, 361, Ann.Cas. 1918B, 856; McKinley v. United States, 249 U.S. 397, 39 S.Ct. 324, 63 L.Ed. 668; United States v. Macintosh, 283 U.S. 605, 622, 623, 51 S.Ct. 570, 574, 75 L.Ed. 1302. Since the Constitution commits to the Executive and to Congress the exercise of the war power in all the vicissitudes and conditions of warfare, it has necessarily given them wide scope for the exercise of judgment and discretion in determining the nature and extent of the threatened injury or danger and in the selection of the means for resisting it. Ex parte Quirin, supra, 317 U.S. [1] 28, 29, 63 S.Ct. [2] 10, 87 L.Ed. [3]; cf. Prize Cases, supra, 2 Black 670, 17 L.Ed. 459; Martin v. Mott, 12 Wheat. 19, 29, 6 L.Ed. 537. Where, as they did here, the conditions call for the exercise of judgment and discretion and for the choice of means by those branches of the Government on which the Constitution has placed the responsibility of war-making, it is not for any court to sit in review of the wisdom of their action or substitute its judgment for theirs."

I am of the opinion that the President's order was valid, that the motion for permanent injunction should be denied and the defendant's motion to dismiss should be sustained.

Since I conclude that the order of the President does not rest upon the validity of

the order of the War Labor Board, it is not necessary or proper that I should pass upon the question which the plaintiff poses as the "unlawfulness of the War Labor Board order".

The United States must, of course, compensate the plaintiff for the use of the property and a determination of the validity of the War Labor Board order would more appropriately arise in the determination of what is to be just and adequate compensation.

Proper orders should be submitted in conformity with this opinion.